T.C. Memo. 2003-145


UNITED STATES TAX COURT


ESTATE OF ALBERT STRANGI, DECEASED, ROSALIE GULIG, INDEPENDENT
EXECUTRIX, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent[*]


Docket No. 4102-99.                     Filed May 20, 2003.


<u>Norman A. Lofgren</u>, <u>G. Tomas Rhodus</u>, and <u>Michael C.
Kelsheimer</u>, for petitioner.

<u>Gerald L. Brantley</u>, <u>Lillian D. Brigman</u>, <u>Janice B. Geier</u>, and
<u>John D. MacEachen</u>, for respondent.


_____


[*] This opinion supplements our previously filed opinion in
<u>Estate of Strangi v. Commissioner</u>, 115 T.C. 478 (2000), affd. in
part and revd. and remanded in part 293 F.3d 279 (5th Cir. 2002).

SUPPLEMENTAL MEMORANDUM FINDINGS OF FACT AND OPINION

COHEN, <u>Judge</u>:  This matter is before the Court on remand from the Court of Appeals for the Fifth Circuit for further consideration consistent with its opinion in <u>Estate of Strangi v. Commissioner</u>, 293 F.3d 279 (5th Cir. 2002) (Strangi II), affg. in part and revg. and remanding in part 115 T.C. 478 (2000) (Strangi I).  The issue for decision on remand is whether the value of property transferred by Albert Strangi (decedent) to the Strangi Family Limited Partnership (SFLP) and Stranco, Inc. (Stranco), is includable in his gross estate pursuant to section 2036(a).  Unless otherwise indicated, all section references are to the Internal Revenue Code in effect as of the date of death, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Facts with respect to this case were found in our original opinion in Strangi I and are incorporated by this reference.  We summarize for convenience relevant facts from Strangi I and set forth additional findings for purposes of deciding the issue on remand.

General Background

Decedent and his first wife had four children:  Jeanne, Rosalie, Albert T., and John Strangi (collectively the Strangi children).  After divorcing his first wife in 1965, decedent

married Irene Delores Seymour (Mrs. Strangi), who had two daughters, Angela and Lynda Seymour (collectively the Seymour daughters), from a previous marriage. In 1985, Rosalie (hereinafter Mrs. Gulig) married Michael J. Gulig (Mr. Gulig), an attorney with the law firm of Sheehy, Lovelace and Mayfield, P.C., in Waco, Texas. On February 19, 1987, decedent and Mrs. Strangi executed wills that named the Strangi children and the Seymour daughters as residual beneficiaries in the event that either spouse predeceased the other.

During 1987 and 1988, Mrs. Strangi suffered a series of serious medical problems. In 1988, decedent and Mrs. Strangi decided to move from their then home in Fort Walton Beach, Florida, to Waco, Texas. To facilitate this move, decedent on July 19, 1988, executed a power of attorney naming Mr. Gulig as his attorney in fact and thereby authorizing Mr. Gulig, in decedent's "name, place and stead":

> To exercise, do, or perform any act, right, power, duty, or obligation whatsoever that I now have or may acquire * * * relating to any person, item, thing, transaction, business property, real or personal, tangible or intangible, or matter whatsoever;

>     *    *    *    *    *    *    *

> To lease, purchase, exchange and acquire, and to bargain, contract, and agree for the lease, purchase, exchange, and acquisition of, and to take, receive and possess any real or personal property whatsoever, tangible or intangible, or interest therein, on such terms and conditions, and under such covenants as the attorney in fact shall deem proper;

To improve, repair, maintain, manage, insure, rent, lease, sell, release, convey, subject to lien, mortgage, hypothecate, and in any way or manner deal with all or any part of any real or personal property whatsoever, intangible, or any interest therein, which I now own or may hereafter acquire, for me and in my name, and under such terms and conditions, and under such covenants as said attorney shall deem proper;

To engage in and transact any and all lawful business of whatever nature or kind for me and in my name;

To sign, endorse, execute, acknowledge, deliver, receive and possess such * * * [contracts, agreements, etc.] and such other instruments in writing of whatever kind and nature as may be necessary or proper in the exercise of the rights and powers herein granted.

Thus, among other things, Mr. Gulig was authorized to close the purchase of a residence in Waco. After the move to Waco, Sylvia Stone (Ms. Stone) was hired as decedent's housekeeper and also provided assistance with the care of Mrs. Strangi.

On July 31, 1990, decedent executed a new will, naming the Strangi children as the sole residual beneficiaries if Mrs. Strangi predeceased him. This will also designated Mrs. Gulig and Ameritrust Texas, N.A. (Ameritrust), as coexecutors of decedent's estate. Mrs. Strangi died on December 27, 1990.

During 1993, decedent had surgery to remove a cancerous mass from his back; was diagnosed with supranuclear palsy (a brain disorder that would gradually reduce his ability to speak, walk, and swallow); and had prostate surgery. Mr. Gulig thereafter took over decedent's affairs pursuant to the 1988 power of

attorney.  Mr. Gulig also developed a close personal relationship with decedent after the death of Mrs. Strangi.  Every morning, Mr. Gulig would visit decedent to have coffee and read the newspaper.

SFLP and Stranco

On August 11, 1994, Mr. Gulig attended a seminar provided by Fortress Financial Group, Inc. (Fortress), on the use of family limited partnerships as a tool for (1) asset preservation, (2) estate planning, (3) income tax planning, and (4) charitable giving.  The following day, on August 12, 1994, Mr. Gulig, as decedent's attorney in fact, formed SFLP, a Texas limited partnership, and its corporate general partner, Stranco, a Texas corporation, and filed with the State of Texas the respective certificate of limited partnership and articles of incorporation. In August 1994 Mr. Gulig believed decedent had about 12 to 18 months to live.  Mrs. Gulig expected decedent to survive about 2 years.

An Agreement of Limited Partnership of Strangi Family Limited Partnership (SFLP agreement) was prepared by Mr. Gulig using documents licensed from Fortress and sets forth the governing provisions for the entity.  Stranco is designated therein as the managing general partner, the authority of which is broadly described as follows:

> Except as otherwise provided in this Agreement, the
> Managing General Partner of the Partnership, shall have

the sole, exclusive and absolute right and authority to act for and on behalf of the Partnership and all of the Partners in connection with all aspects of the business of the Partnership.

More specifically, the SFLP agreement enumerates various rights, powers, and authorities of the managing general partner, including without limitation "to acquire, hold, lease, encumber, pledge, option, sell, exchange, transfer, dispose or otherwise deal with real or personal property (or rights or interests therein) of any nature whatsoever as may be necessary or advisable for the operation of the Partnership"; "to borrow or lend money for Partnership purposes"; and "to determine the use of the revenues of the Partnership for Partnership purposes". The SFLP agreement obligates the managing general partner to use its good faith efforts to manage partnership affairs in a prudent and businesslike manner and to act at all times in the best interests of the partnership. According to the SFLP agreement, limited partners are without "any authority or right to take part in the management of the business or transact any business" for the entity.

As regards distributions, the SFLP agreement provides that income from operations and capital transactions, after deduction for certain listed expenses:

shall be distributed at such times and in such amounts as the Managing General Partner, in its sole discretion, shall determine, taking into account the reasonable business needs of the Partnership (including plan for expansion of the Partnership's business). The

> Managing General Partner's determination regarding whether or not to make distributions and the amount of distributions to be made shall be final and binding on all Partners.  Such distributions shall be made to each Partner in accordance with such Partner's Interest in the Partnership.

Likewise, "Assets of the Partnership may be distributed in kind in the sole and absolute discretion of the Managing General Partner."

Pursuant to the SFLP agreement, the partnership would be dissolved and terminated upon:  (1) A unanimous vote of the limited partners and unanimous consent of the general partners; (2) a decision of the managing general partner after the disposition of substantially all partnership assets; (3) an entry of judicial dissolution; (4) the death, insolvency, bankruptcy, removal, or withdrawal of any general partner, unless the limited partners within 90 days unanimously elect a new general partner to continue the business; (5) the involuntary transfer of a general partnership interest in the event there is only one general partner, unless the limited partners within 90 days vote unanimously to continue the partnership; or (6) December 31, 2014.

Upon dissolution and termination, SFLP was to be liquidated. The managing general partner was designated as liquidator and instructed to dispose of partnership assets first in payment of third-party debts, then in repayment of loans from partners, and

finally in repayment to partners of positive capital account balances.

By a series of transfer documents, Mr. Gulig assigned to SFLP property of decedent with a fair market value of $9,876,929, constituting approximately 98 percent of decedent's wealth, in exchange for a 99-percent limited partnership interest. The contributed property included decedent's interest in specified real estate (including the residence occupied by decedent), securities, accrued interest and dividends, insurance policies, an annuity, receivables, and partnership interests. About 75 percent of the contributed value was attributable to cash and securities. The majority of the asset transfer documents were dated August 12, 1994, while change of ownership forms for the life insurance policies were executed on August 14 and 15, 1994. Letters dated August 15, 1994, were also sent to the brokers holding decedent's securities accounts, to those administering the contributed partnership interests, and to the borrowers on notes payable to decedent advising them regarding transfer of the underlying assets to SFLP. All of the contributed property was reflected in decedent's capital account. Brokerage and bank accounts were opened in the name of the partnership during the period from August through October.

Mr. Gulig invited the Strangi children to participate in SFLP through an interest in Stranco. Decedent purchased

47 percent of Stranco for $49,350, and Mrs. Gulig purchased the remaining 53 percent for $55,650 on behalf of herself and her three siblings (with each thereby acquiring a 13.25-percent interest). The moneys were deposited into a bank account opened in August 1994 in Stranco's name. Stranco contributed a portion of these funds to SFLP in exchange for a 1-percent general partnership interest.

Stranco's articles of incorporation named decedent and the Strangi children as the initial five directors. On August 17, 1994, the Strangi children and Mr. Gulig met to execute the Stranco bylaws, a shareholders agreement, and a "Consent of Directors Authorizing Corporate Action in Lieu of Organizational Meeting" effective as of August 12, 1994. They also signed a "Unanimous Consent of Directors in Lieu of Special Meeting" that authorized the corporate president to execute a management agreement employing Mr. Gulig.

The Stranco bylaws set forth provisions governing corporate formalities. As pertains to shareholders, the bylaws state that a majority of the outstanding shares shall constitute a quorum at a meeting. Shareholders may also take informal action by means of a consent in writing signed by all shareholders.

Concerning directors, the bylaws specify that there shall be five directors, one of whom shall be elected president. At a meeting of the board, a majority of the directors then serving

shall constitute a quorum, and the act of a majority of the directors present at a meeting with a quorum shall be the act of the board.  Directors may also take informal action by a written consent signed by all directors.  The president shall be the principal executive officer of the corporation and, subject to the control of the board, shall generally supervise and control all of the business and affairs of the corporation.  Among the particular powers or duties placed under the board is the payment of dividends, as follows:  "The Board of Directors may declare, and the corporation may pay, dividends on its outstanding shares in any manner and upon any terms and conditions not restricted by the Articles of Incorporation or prohibited by law."

The management agreement executed by Stranco and Mr. Gulig described his duties as follows:

> Scope of Employment.  Employee is hired to manage the day-to-day business of Employer.  Additionally, the Employee shall manage the day-to-day business of the Strangi Family Limited Partnership, a Texas limited partnership (the "Partnership") in which Employer serves as the sole general partner and the managing partner of the Partnership.  During the term of this Agreement, the Employee shall devote such portion of his time, attention, and energies to the businesses of the Employer and the Partnership and will diligently and to the best of his ability perform all duties incident to his employment hereunder.  The duties of Employee shall include, but not be limited to, management of the Partnership's rental properties, cash and investment management, and the preparation and filing of all required governmental reports including tax returns.

In the shareholders agreement, decedent and the Strangi children agreed that at each annual meeting they would vote to reelect themselves (or a nominee) as the five directors. They further agreed that, if a vacancy occurred on the board by reason of the death, disability, resignation, retirement, or removal of a director so elected, they would cause the bylaws to be amended so as to reduce by one the number of directors.

Thereafter, each of the four Strangi children gave a .25-percent interest in Stranco to McLennan Community College Foundation (MCC Foundation), and the charity became a 1-percent shareholder in the corporation. MCC Foundation accepted the gift by execution on August 18, 1994, of an agreement to be bound by the terms of the preexisting shareholders agreement.

Decedent died of cancer on October 14, 1994, at the age of 81. Following decedent's death, Texas Commerce Bank, N.A. (TCB), successor in interest to Ameritrust, was asked to decline to serve as coexecutor of his estate. TCB subsequently did so, and decedent's will was admitted to probate on April 12, 1995, with Mrs. Gulig appointed as the sole executor.

After its formation, various monetary outlays were made from SFLP. From September 1993 until his death, decedent required 24-hour home health care that was provided by Olsten Healthcare (Olsten) and supplemented by Ms. Stone. During this time and while assisting decedent, Ms. Stone injured her back. The

resultant back surgery was paid for by SFLP. SFLP also paid nearly $40,000 in 1994 for funeral expenses, estate administration expenses, and related debts of decedent, including a $19,810.28 check to Olsten for nursing services. SFLP then paid more than $65,000 in 1995 and 1996 for estate expenses and a specific bequest to decedent's sister. In July 1995, SFLP distributed $3,187,800 to decedent's estate for Federal estate and State inheritance taxes. When such disbursements were made to or for the benefit of decedent or his estate, Stranco received corresponding and proportionate sums either in cash or in the form of adjusting journal entries. For accounting purposes, certain amounts expended by SFLP were initially recorded on its books as advances to, and accounts receivable from, partners. SFLP also accrued rent on the residence occupied by decedent and reported the rental income on its 1994 income tax return. The accrued amount was paid in January 1997. Mr. Gulig made all entries into the books and records of SFLP and Stranco and prepared all income tax returns for the entities.

Estate Tax Proceedings

On January 17, 1996, a Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return, filed on behalf of decedent's estate was received by the Internal Revenue Service. The value reported on the Form 706 for the gross estate was $6,823,582, which included $6,560,730 for decedent's interest in

SFLP and $24,551 for his stock in Stranco.  The total value of the property held by SFLP as of the date of death was $11,100,922, to which discounts were applied in calculating the reported fair market value.  The Form 706 also reflected other assets of $238,301 (including household and personal items, vehicles, securities, certain receivables, and bank account balances totaling $762) and claimed deductions of $43,280 for debts of decedent (including $5,161 for rents to SFLP) and $107,108 for expenses.

In a statutory notice dated December 1, 1998, respondent determined a deficiency in Federal estate tax of $2,545,826 and an alternative deficiency in Federal gift tax of $1,629,947.  The estate tax deficiency resulted in large part from respondent's conclusion that decedent's interest in SFLP should be increased by $4,386,613 (to $10,947,343) and his interest in Stranco should be increased by $29,009 (to $53,560).

The proceedings in Strangi I were initiated in response to the foregoing notice of deficiency.  Prior to trial, respondent attempted by motion to raise section 2036 as an issue.  Strangi I at 486.  That motion was denied as untimely.  Id.  With respect to the remaining issues, we held in Strangi I at 486-493: (1) The partnership was valid under State law and would be recognized for estate tax purposes; (2) section 2703 did not apply to the partnership agreement; (3) the transfer of assets to

SFLP was not a taxable gift; and (4) decedent's interests in SFLP and Stranco should be valued using the discounts applied by respondent's expert.

After entry of decision, respondent appealed to the Court of Appeals for the Fifth Circuit. The appellate court ruled as follows:

> We REVERSE the Tax Court's denial of leave to amend and REMAND with instructions that the court either (1) set forth its reasons for adhering to its denial of the Commissioner's motion for leave to amend, bearing in mind the mandate of the Federal Rule of Civil Procedure 15(a), or (2) reverse its denial of the Commissioner's motion, permit the amendment, and consider the Commissioner's claim under sec. 2036. We AFFIRM all other conclusions made by the tax court. [Strangi II at 282.]

Over petitioner's objection, leave was granted for respondent's amendment to answer and a second amendment to answer raising section 2036.

OPINION

I. Inclusion in the Gross Estate--Section 2036

A. General Rules

As a general rule, the Internal Revenue Code imposes a Federal tax "on the transfer of the taxable estate of every decedent who is a citizen or resident of the United States." Sec. 2001(a). The taxable estate, in turn, is defined as "the value of the gross estate", less applicable deductions. Sec. 2051. Section 2031(a) specifies that the gross estate comprises

"all property, real or personal, tangible or intangible, wherever situated", to the extent provided in sections 2033 through 2045.

Section 2033 broadly states that "The value of the gross estate shall include the value of all property to the extent of the interest therein of the decedent at the time of his death." Sections 2034 through 2045 then explicitly mandate inclusion of several more narrowly defined classes of assets. Among these specific sections is section 2036, which reads in pertinent part as follows:

> SEC. 2036.  TRANSFERS WITH RETAINED LIFE ESTATE.
>
> (a) General Rule.--The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death--
>
> > (1) the possession or enjoyment of, or the right to the income from, the property, or
>
> > (2) the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom.

Regulations further explain that "An interest or right is treated as having been retained or reserved if at the time of the transfer there was an understanding, express, or implied, that the interest or right would later be conferred." Sec. 20.2036-1(a), Estate Tax Regs.

Given the language used in the above-quoted provisions, it has long been recognized that "The general purpose of this section is 'to include in a decedent's gross estate transfers that are essentially testamentary' in nature." Ray v. United States, 762 F.2d 1361, 1362 (9th Cir. 1985) (quoting United States v. Estate of Grace, 395 U.S. 316, 320 (1969)). Accordingly, courts have emphasized that the statute "describes a broad scheme of inclusion in the gross estate, not limited by the form of the transaction, but concerned with all inter vivos transfers where outright disposition of the property is delayed until the transferor's death." Guynn v. United States, 437 F.2d 1148, 1150 (4th Cir. 1971).

As used in section 2036(a)(1), the term "enjoyment" has been described as "synonymous with substantial present economic benefit." Estate of McNichol v. Commissioner, 265 F.2d 667, 671 (3d Cir. 1959), affg. 29 T.C. 1179 (1958); see also Estate of Reichardt v. Commissioner, 114 T.C. 144, 151 (2000). Regulations additionally provide that use, possession, right to income, or other enjoyment of transferred property is considered as having been retained or reserved "to the extent that the use, possession, right to the income, or other enjoyment is to be applied toward the discharge of a legal obligation of the decedent, or otherwise for his pecuniary benefit." Sec. 20.2036-1(b)(2), Estate Tax Regs. Moreover, possession or enjoyment of

transferred property is retained for purposes of section 2036(a)(1) where there is an express or implied understanding to that effect among the parties at the time of the transfer, even if the retained interest is not legally enforceable. Estate of Maxwell v. Commissioner, 3 F.3d 591, 593 (2d Cir. 1993), affg. 98 T.C. 594 (1992); Guynn v. United States, supra at 1150; Estate of Reichardt v. Commissioner, supra at 151; Estate of Rapelje v. Commissioner, 73 T.C. 82, 86 (1979). The existence or nonexistence of such an understanding is determined from all of the facts and circumstances surrounding both the transfer itself and the subsequent use of the property. Estate of Reichardt v. Commissioner, supra at 151; Estate of Rapelje v. Commissioner, supra at 86.

As used in section 2036(a)(2), the term "right" has been construed to connote "an ascertainable and legally enforceable power". United States v. Byrum, 408 U.S. 125, 136 (1972). Nonetheless, regulations clarify:

> With respect to such a power, it is immaterial (i) whether the power was exercisable alone or only in conjunction with another person or persons, whether or not having an adverse interest; (ii) in what capacity the power was exercisable by the decedent or by another person or persons in conjunction with the decedent; and (iii) whether the exercise of the power was subject to a contingency beyond the decedent's control which did not occur before his death (e.g., the death of another person during the decedent's lifetime). The phrase, however, does not include a power over the transferred property itself which does not affect the enjoyment of the income received or earned during the decedent's life. * * * Nor does the phrase apply to a power held

> solely by a person other than the decedent.  But, for example, if the decedent reserved the unrestricted power to remove or discharge a trustee at any time and appoint himself as trustee, the decedent is considered as having the powers of the trustee.  [Sec. 20.2036-1(b)(3), Estate Tax Regs.]

Additionally, retention of a right to exercise managerial power over transferred assets or investments does not of itself result in inclusion under section 2036(a)(2).  United States v. Byrum, supra at 132-134.

An exception to the treatment mandated by section 2036(a) exists where the facts establish "a bona fide sale for an adequate and full consideration in money or money's worth".

B.  Burden of Proof

Typically, the burden of disproving the existence of an agreement regarding a retained interest has rested on the estate, and this burden has often been characterized as particularly onerous in intrafamily situations.  Estate of Maxwell v. Commissioner, supra at 594; Estate of Reichardt v. Commissioner, supra at 151-152; Estate of Rapelje v. Commissioner, supra at 86. In this case, however, the section 2036 issues are new matters within the meaning of Rule 142(a).  Thus, the burden of proof is on respondent.

C.  Existence of a Retained Interest

Respondent contends that the value of the property transferred to SFLP and Stranco is includable in decedent's gross estate under either section 2036(a)(1) or section 2036(a)(2).

Underlying both of these arguments is the particular structure of the SFLP/Stranco arrangement, as set forth in the relevant governing documents.

The SFLP agreement provides that distributions of proceeds and assets from the entity shall be made in the sole discretion of the managing general partner. The SFLP agreement also designates Stranco as the managing general partner. Stranco, in turn, executed the management agreement employing Mr. Gulig to manage the day-to-day business of SFLP, as well as of Stranco itself. Yet Mr. Gulig was already decedent's attorney in fact pursuant to the 1988 general power of attorney. Under this instrument, Mr. Gulig was granted full and durable authority to act for decedent in his "name, place and stead". Mr. Gulig set up the SFLP/Stranco arrangement to facilitate decedent's estate planning goals and capitalized the partnership primarily with decedent's property.

When distilled to their most essential terms, the governing documents gave Mr. Gulig authority to specify distributions from SFLP, which is entirely consistent with his authority under the 1988 power of attorney. Although the estate protests that Mr. Gulig's authority under the management agreement was limited to managing "the day-to-day business" of the partnership and did not extend to making distributions or loans, the pertinent instruments provide no basis for concluding that making

distributions would be outside the day-to-day business of a partnership capitalized nearly exclusively with investment assets. As a practical matter, actual disbursement of funds occurred when checks were issued by Mr. and Mrs. Gulig in their various related capacities, pursuant to rights granted to them by decedent, acting through Mr. Gulig.

Hence, to summarize, the SFLP agreement named Stranco managing general partner with the sole discretion to determine distributions. The Stranco shareholders, including decedent (through Mr. Gulig), then acted together to delegate such authority to Mr. Gulig under the management agreement. Decedent's attorney in fact thereby stood in a position to make distribution decisions. Mrs. Gulig effectuated these decisions by signing checks to the recipients so designated.

1. <u>Section 2036(a)(1)</u>

Section 2036(a)(1) provides for inclusion of transferred property with respect to which the decedent retained, by express or implied agreement, possession, enjoyment, or the right to income. Enjoyment in this context is equated with present economic benefit.

a. <u>Right to income</u>

As a threshold matter, we observe that our analysis above of the express documents suggests inclusion of the contributed property under section 2036(a)(1) based on the "right to the

income" criterion, without need further to probe for an implied agreement regarding other benefits such as possession or enjoyment. The governing documents contain no restrictions that would preclude decedent himself, acting through Mr. Gulig, from being designated as a recipient of income from SFLP and Stranco. Such scenario is consistent with the reach of the right to income phrase as we described it in Estate of Pardee v. Commissioner, 49 T.C. 140, 148 (1967):

> section 2036(a)(1) refers not only to the possession or enjoyment of property but also to "right to the income" from property. The section does not require that the transferor pull the "string" or even intend to pull the string on the transferred property; it only requires that the string exist. See McNichol's Estate v. Commissioner, 265 F.2d 667, 671 (C.A. 3, 1959), affirming 29 T.C. 1179 (1958) * * *

    b. Possession or enjoyment

The facts of this case support the finding of an implied agreement for retained possession or enjoyment. We have previously considered implicit retention of these benefits under section 2036(a)(1) in situations involving family limited partnerships in Estate of Reichardt v. Commissioner, 114 T.C. 144 (2000); Estate of Thompson v. Commissioner, T.C. Memo. 2002-246; Estate of Harper v. Commissioner, T.C. Memo. 2002-121; and Estate of Schauerhamer v. Commissioner, T.C. Memo. 1997-242. Although the instant case is based on limited post-transfer history, due in part to decedent's death only 2 months after creation of the partnership, we conclude that the reasoning underlying those

opinions directs a like result here.  Fundamentally, the preponderance of the evidence shows that decedent as a practical matter retained the same relationship to his assets that he had before formation of SFLP and Stranco.

Circumstances that have been found probative of an implicitly retained interest under section 2036(a)(1) include transfer of the majority of the decedent's assets, continued occupation of transferred property, commingling of personal and entity assets, disproportionate distributions, use of entity funds for personal expenses, and testamentary characteristics of the arrangement.  Guynn v. United States, 437 F.2d at 1150; Estate of Reichardt v. Commissioner, supra at 152-154; Estate of Thompson v. Commissioner, supra; Estate of Harper v. Commissioner, supra; Estate of Trotter v. Commissioner, T.C. Memo. 2001-250; Estate of Schauerhamer v. Commissioner, supra.

At the outset, we acknowledge that, in contrast to certain of the prior cases, the participants involved in the SFLP/Stranco arrangement generally proceeded such that "the proverbial 'i's were dotted' and 't's were crossed'."  Strangi I at 486.  Steps were taken to abide by the formal terms of the structure created. Such measures may give SFLP and Stranco sufficient substance to be recognized as legal entities in the context of valuation, which requires assumption of a hypothetical buyer and seller. They do not preclude implicit retention by decedent of economic

benefit from the transferred property for purposes of section 2036(a)(1).

First, we cannot lose sight of the fact that decedent contributed approximately 98 percent of his wealth, including his residence, to the SFLP/Stranco arrangement.  Respondent alleges that the transfer left decedent with inadequate assets and cash flow to meet his living expenses, to which the estate takes objection.  The estate goes to great lengths to counter respondent's assertion, claiming that decedent at his death possessed liquefiable assets of at least $172,000 and received on a monthly basis a pension of $1,438.18 and Social Security of $1,559.  The estate also stresses that respondent has not established the amount of decedent's living expenses and maintains that, even if the $33,323.22 in checks paid from decedent's account in August and September were used as an estimate, the purported liquefiable assets would have covered decedent's needs for his concededly short life expectancy of 12 to 24 months.  However, the relative dearth of liquefied (decedent's Form 706 showed two bank accounts with funds totaling $762), as opposed to "liquefiable", assets persuades us that decedent and his children and Mr. Gulig all expected that SFLP and Stranco would be a primary source of decedent's liquidity. It is unreasonable to expect that decedent would be forced to rely on sale of assets to meet his basic costs of living.

A second feature highly probative under section 2036(a)(1) is decedent's continued physical possession of his residence after its transfer to SFLP. The estate maintains that any otherwise negative implications of this circumstance are neutralized by the fact that SFLP "charged Mr. Strangi rent" on occupancy of the home and reported rental income on its 1994 tax return. Decedent likewise reported a rent obligation on his estate tax return. For accounting purposes, the accrued rent was recorded by SFLP on its books. Yet the accrued amount was not paid until January 1997. A residential lessor dealing at arm's length would hardly be content merely to accrue a rental obligation for eventual payment more than 2 years later. As we have remarked, accounting entries alone are of small moment in belying the existence of an agreement for retained possession and enjoyment. Estate of Reichardt v. Commissioner, 114 T.C. at 154-155; Estate of Harper v. Commissioner, T.C. Memo. 2002-121.

Concerning factors that relate to use of entity funds, the estate emphasizes that each disbursement for decedent or his estate was accompanied by a pro rata allotment to Stranco. Where, as here, the only interest in the partnership other than that held by the decedent is de minimis, a pro rata payment is hardly more than a token in nature. In these circumstances, pro rata disbursements are insufficient to negate the probability that the decedent retained economic enjoyment of his or her

assets.  After all, distributing 1 percent to Stranco would not in any substantial way operate to curb decedent's ability to benefit from SFLP property.  Accordingly, we direct our attention to the purpose, as opposed to the mechanics, of partnership distributions and expenditures.

The record reveals several instances where SFLP expended funds in response to a need of decedent or his estate.  SFLP paid for Ms. Stone's back surgery to alleviate an injury she sustained in caring for decedent prior to the formation of SFLP.  In 1994, SFLP expended nearly $40,000 for funeral expenses, estate administration, and related debts, including a $19,810.28 check to Olsten to pay for nursing services rendered to decedent before his death.  These sums were followed in 1995 and 1996 by further payment of over $65,000 for estate expenses and a specific bequest.  SFLP also disbursed approximately $3 million directed toward decedent's estate and inheritance taxes.

The estate seeks to justify these payments primarily by emphasizing that they were accounted for on SFLP's books as advances to partners and later closed as distributions, with pro rata amounts either advanced or distributed to Stranco.  The evidence also indicates that the $65,000-plus amount was repaid in January 1997.  The estate further explains that certain of these payments from SFLP were necessitated by the delay in

probate of decedent's estate engendered by the process of getting TCB to decline executorship.

To the extent that the estate's arguments focus on accounting manipulations, they are unavailing. As demonstrated in Estate of Reichardt v. Commissioner, supra at 154-155, and Estate of Harper v. Commissioner, supra, accounting adjustments do not preclude a conclusion that those involved understood that the decedent's assets would be made available as needs materialized. Belated repayment of certain amounts likewise does not refute the inference of an implicit agreement for retained enjoyment that arises from the demonstrated and contemporaneous availability of large sums. Furthermore, to the extent that the estate's explanations focus on a delay in probate, they lack specificity. The more salient feature would appear to be the insufficiency of the assets not contributed to SFLP and Stranco to cover the significant expenses reasonably to be expected to ensue in connection with decedent's poor health and death. That, in turn, speaks to retained enjoyment.

Regarding testamentary characteristics, the SFLP/Stranco arrangement also bears greater resemblance to one man's estate plan than to any sort of arm's-length, joint enterprise. As in Estate of Harper v. Commissioner, supra, "the largely unilateral nature of the formation, the extent and type of the assets contributed thereto, and decedent's personal situation are

indicative." Mr. Gulig established the entities using Fortress documents with little, if any, input from other family members. The contributed property included the majority of decedent's assets in general and his investments, a prime concern of estate planning, in particular. Decedent was advanced in age and suffering from serious health conditions. Furthermore, as discussed in Strangi I at 485-486, the purpose of the partnership arrangement was not to provide a joint investment vehicle for the management of decedent's assets, but was consistent with testamentary intent.

Moreover, the crucial characteristic is that virtually nothing beyond formal title changed in decedent's relationship to his assets. Mr. Gulig managed decedent's affairs both before and after the transfer. Decedent's children did not obtain a meaningful economic stake in the property during decedent's life. They raised no objections or concerns when large sums were advanced for expenditures of decedent or his estate, thus implying an understanding that decedent's access thereto would not be restricted.

In face of the foregoing realities, the estate argues that whatever possession or enjoyment of the contributed property decedent may have experienced was neither "retained" by means of a contemporaneous agreement nor "with respect to the transferred property". As regards the first point, the estate contends that

respondent has offered no evidence to prove a contemporaneous agreement requiring the distributions made, as opposed to an independent subsequent decision by Stranco to make the same outlay. According to the estate:

> Even if decisions to make distributions were made based on "sympathy for poor old dad," i.e., "Oops, Mr. Strangi imprudently put too much money into SFLP and we need to give some back" that would not meet the criteria set by judicial precedent for determining the existence of a retained expectation of possession of [sic] enjoyment: which is that there must have been an implied agreement that was contemporaneous with the transfer of the property at issue, not a subsequent agreement or act. * * * [Fn. ref. omitted.]

We are persuaded that the evidence and circumstances detailed above render such a contemporaneous agreement more likely than not.

The second point mentioned stems from the estate's view that pro rata distributions were made not with respect to the transferred property, in which decedent possessed no legal interest under the Texas Revised Limited Partnership Act (TRLPA), Tex. Rev. Civ. Stat. Ann. art. 6132a-1, sec. 7.01 (Vernon Supp. 2003), but with respect to his partnership interest. Yet this argument relies on paper title to the exclusion of the practicalities that are the focus of section 2036(a)(1). The property contributed by decedent was the source of the payments made. Furthermore, the record suggests that the impetus underlying a number of significant SFLP disbursements was needs

of decedent or his estate, rather than exigencies pertaining to Stranco or the partnership itself.

Hence, the preponderance of the evidence establishes that decedent retained possession of, enjoyment of, or the right to income from the property transferred within the meaning of section 2036(a)(1).

### 2. Section 2036(a)(2)

Although we have held supra that section 2036(a)(1) requires the estate to include the value of the transferred assets in the gross estate for Federal estate tax purposes, the parties have argued extensively over the issue of whether section 2036(a)(2) applies. Consequently, we address the applicability of section 2036(a)(2) to the instant case. As stated above, section 2036(a)(2) mandates inclusion in the gross estate of transferred property with respect to which the decedent retained the right to designate the persons who shall possess or enjoy the property or its income. This provision was interpreted by the Supreme Court in United States v. Byrum, 408 U.S. 125 (1972), and both parties devote a significant portion of their respective arguments to the implications of that decision. We address these arguments as an alternative to our conclusions concerning section 2036(a)(1) and with particular consideration of the facts of this case.

In United States v. Byrum, supra at 126, the decedent, Mr. Byrum, created an irrevocable trust for the benefit of his

children.  He funded the trust with shares of three closely held corporations but retained the right to vote the shares and to veto any sale or transfer of the stock.  Id. at 126-127.  As a result, Mr. Byrum at his death continued to have the right to vote not less than 71 percent of the common stock in each of the three corporations.  Id. at 128-129.  The three corporations were involved in lithography-related businesses and had a substantial number of minority shareholders unrelated to Mr. Byrum.  Id. at 130 & n.2, 142 & n.20.  (The Supreme Court noted that 11 of 12, 5 of 8, and 11 of 14 stockholders, respectively, in the three corporations appeared to be unrelated to Mr. Byrum.  Id. at 142 n.20.)  The trust instrument specified that there be, and Mr. Byrum named, an independent corporate trustee.  Id. at 126.  The trustee was authorized in its "absolute and sole discretion" to pay income and principal to or for the benefit of the beneficiaries.  Id. at 127.

The Commissioner argued that, by retaining voting control over the corporations, Mr. Byrum was in a position to select the corporate directors and thereby to control corporate dividend policy.  Id. at 131-132.  According to the Commissioner, the scenario in dispute gave Mr. Byrum the ability to regulate the flow of income to the trust, which ability was characterized as tantamount to a grantor-trustee's power to accumulate trust income for remaindermen or to distribute to present

beneficiaries.  Id. at 132.  The Court had previously ruled that the latter power to accumulate rather than disburse constituted a right to designate under section 2036(a)(2).  Id. at 135-136; United States v. O'Malley, 383 U.S. 627, 631 (1966).

Given the above facts, the Supreme Court held "that Byrum did not have an unconstrained de facto power to regulate the flow of dividends to the trust, much less the 'right' to designate who was to enjoy the income from trust property."  United States v. Byrum, 408 U.S. at 143.  The Court rejected the Commissioner's "control rationale" as it "would create a standard--not specified in the statute--so vague and amorphous as to be impossible of ascertainment in many instances."  Id. at 137 n.10.  In reaching its conclusion, the Court relied on a series of "economic and legal constraints" to which any power that Mr. Byrum might have had was subject and which prevented such power from being equivalent to a right to designate persons to enjoy trust income.  Id. at 144.

The Court emphasized that the independent corporate trustee alone had the right under the trust instrument to pay out or withhold income.  Id. at 137.  Even if Mr. Byrum had managed to flood the trust with dividends, he had no way of compelling the trustee to pay out or accumulate that income.  Id. at 143.  The Court also noted that the power to elect directors conferred no legal right to command them to pay or not pay dividends.  Id. at

137. Moreover, the flow of dividends from the corporations would be subject to economic vicissitudes, retained earnings policies, and business needs. Id. at 139-140. In this regard, the Court explained:

> There is no reason to suppose that the three corporations controlled by Byrum were other than typical small businesses. The customary vicissitudes of such enterprises--bad years; product obsolescence; new competition; disastrous litigation; new, inhibiting Government regulations; even bankruptcy--prevent any certainty or predictability as to earnings or dividends. There is no assurance that a small corporation will have a flow of net earnings or that income earned will in fact be available for dividends. Thus, Byrum's alleged de facto "power to control the flow of dividends" to the trust was subject to business and economic variables over which he had little or no control. [Id. at 249.]

Furthermore, the Supreme Court stressed that "A majority shareholder has a fiduciary duty not to misuse his power by promoting his personal interests at the expense of corporate interests" and the directors of a corporation "have a fiduciary duty to promote the interests of the corporation." Id. at 137-138. Such duties were legally enforceable by means of, for example, a derivative suit. Id. at 141-142.

With respect to the case at bar, the estate asserts that decedent retained no legally enforceable rights of the genre required by United States v. Byrum, supra. The estate emphasizes that management powers are insufficient to warrant inclusion and points out that, under the SFLP agreement, the limited partner was without even the right to exercise any managerial authority.

The estate likewise reiterates that "right" as used in section 2036(a)(2) is not to be construed as control and notes that, under the TRLPA, Tex. Rev. Civ. Stat. Ann. art. 6132a-1, sec. 3.03 (Vernon Supp. 2003), a limited partner expressly does not participate in control of the business of a partnership by virtue of acting as an officer, director, or stockholder of a corporate general partner. In this connection, the estate also remarks that, as a minority shareholder of Stranco, decedent was without the ability to elect a majority of directors, thus retaining even less control than was present in United States v. Byrum, supra.

Moreover, the estate repeatedly invokes the concept that "any power which Mr. Strangi or Stranco might have would be subject to state law fiduciary duties. Such fiduciary duties effectively render Section 2036(a)(2) inapplicable under the teaching of Byrum."

Conversely, it is respondent's position that United States v. Byrum, supra, fails to shield the assets placed in SFLP and Stranco from the reach of section 2036. Respondent avers that decedent had legally enforceable rights based on the relevant written agreements, not mere de facto control or influence. Respondent argues that decedent's rights go beyond the management powers and influence at issue in United States v. Byrum, supra, and extend to designation of persons who shall enjoy entity property and income. Respondent sets forth several ways in which

decedent's authority can be derived from the provisions of the governing documents and the roles played by the family members involved.  Furthermore, respondent maintains that no impediments comparable to those in United States v. Byrum, supra, existed to constrain decedent's powers and that the Supreme Court's reasoning is therefore inapplicable here.  In the particular circumstances of this case, we agree with respondent.

### a.  Legally enforceable rights

On these facts, decedent can properly be described as retaining a right to designate who shall enjoy property and income from SFLP and Stranco within the meaning of section 2036(a)(2).  In this regard, it is immaterial whether we characterize the pertinent documents and relationships as creating rights exercisable by decedent alone, in conjunction with other Stranco shareholders, or in conjunction with Stranco's president.  See sec. 20.2036-1(b)(3), Estate Tax Regs.

With respect to SFLP income and as previously recounted in greater detail, the SFLP agreement named Stranco managing general partner and conferred on the managing general partner sole discretion to determine distributions.  The Stranco shareholders, including decedent (through Mr. Gulig), then acted together to delegate this authority to Mr. Gulig through the management agreement.  The effect of these actions placed decedent's attorney in fact in a position to make distribution decisions.

Mrs. Gulig effectuated such decisions by executing checks to the recipients so designated.

In addition to the rights described above related to income, decedent also retained the right, acting in conjunction with other Stranco shareholders, to designate who shall enjoy the transferred SFLP property itself. The Supreme Court indicated in United States v. Byrum, 408 U.S. at 143 n.23 (citing Commissioner v. Estate of Holmes, 326 U.S. 480 (1946)), that a "power to terminate the trust and thereby designate the beneficiaries at a time selected by the settlor" would implicate section 2036(a)(2). Pursuant to the SFLP agreement, the partnership would be dissolved and terminated upon a unanimous vote of the limited partners and the unanimous consent of the general partner. The shareholders agreement likewise specifies that dissolution of SFLP requires the affirmative vote of all Stranco shareholders. Once dissolution and termination occur, liquidation is accomplished as set forth in the SFLP agreement. The managing general partner is named as the liquidator, which in turn disburses partnership assets first in payment of debts and then in repayment of partners' capital account balances. Authority is expressly granted for distributions in kind. Accordingly, decedent can act together with other Stranco shareholders essentially to revoke the SFLP arrangement and thereby to bring about or accelerate present enjoyment of partnership assets.

Furthermore, it is noteworthy that such action would likely revest in decedent himself, as the 99-percent limited partner, the majority of the contributed property.

As regards property transferred to Stranco and income therefrom, decedent held the right, in conjunction with one or more other Stranco directors, to declare dividends. The corporation's bylaws authorize the board of directors to declare dividends from the entity. For the board to take such action, a majority vote of the directors at a meeting with a quorum present is sufficient. Under the bylaws, a majority of the directors then serving constitutes a quorum. Because Stranco had five directors, a quorum would consist of three, so two directors (e.g., decedent through Mr. Gulig and one other) could potentially act together to declare a dividend. The Stranco shareholders agreement further provided that each of the initial five directors would be reelected annually, thus effectively ensuring decedent's position on the board.

In response to various of the above concepts pertaining to joint action, particularly by stockowners, the estate suggests: "If the mere fact that a shareholder could band together with all of the other shareholders of a corporation and such banding together would be sufficient to cause inclusion under Section 2036, then it would have been impossible for the United States Supreme Court to reach the decision that it did in Byrum." The

estate's observation ignores the existence in <u>United States v. Byrum</u>, <u>supra</u>, of the independent trustee who alone had the ability to determine distributions from the disputed trust, notwithstanding any prior action by corporate owners or directors. It also ignores the identity of the shareholders in this case and the dual roles played by Mr. Gulig.

To summarize, review of the documentary evidence discussed above reveals that decedent here retained rights of a far different genre from those at issue in <u>United States v. Byrum</u>, <u>supra</u>. Rather than mere "control", management, or influence, there are traceable to decedent through the explicit provisions of the governing instruments ascertainable and legally enforceable rights to designate persons who shall enjoy the transferred property and its income. The estate's reliance on a limited partner's lack under the TRLPA of participation in control and under the SFLP agreement of management authority is thus misplaced. The alleged absence of such powers cannot negate the dispositive rights granted in the instant case. The SFLP/Stranco arrangement placed decedent in a position to act, alone or in conjunction with others, through his attorney in fact, to cause distributions of property previously transferred to the entities or of income therefrom. Decedent's powers, absent sufficient limitation as discussed <u>infra</u>, therefore fall within the purview of section 2036(a)(2).

### b.  Constraints upon rights to designate

The Supreme Court in United States v. Byrum, supra, relied upon several impediments to the exercise of powers held by Mr. Byrum in concluding that such powers did not warrant inclusion under section 2036(a)(2).  Here, the rights held by decedent are of a different nature and were not accompanied by comparable constraints.  In our view, the constraints alleged by the estate are illusory.

One circumstance highlighted by the Supreme Court was the existence of an independent trustee with the sole authority ultimately to pay or withhold income from the trust.  Here, in contrast, no similar layer of independence was interposed.  Rather, decisions with respect to distributions were placed in Stranco, of which decedent owned 47 percent and was the largest shareholder.  All decisions ultimately were made by Mr. Gulig, who continued to act as decedent's attorney in fact.

Another element stressed by the Supreme Court was the manner in which the flow of funds allegedly under Mr. Byrum's control would be subject to economic and business realities consequent upon the status of the relevant corporations as typical small operating enterprises.  Earnings and dividends of a small operating company could be affected by, inter alia, changes in products, in competition, or in industry regulation and outlook; use of funds for replacement of plant and equipment or for growth

and expansion; and the need to retain sufficient earnings for working capital. These complexities do not apply to SFLP or Stranco, which held only monetary or investment assets.

Yet another constraining factor cited by the Supreme Court was the presence of fiduciary duties held by directors and shareholders, and it is upon this aspect of the Supreme Court's opinion that the estate focuses. The Supreme Court emphasized that corporate directors and shareholders have a fiduciary duty to promote the best interests of the entity, as opposed to their personal interests. The Supreme Court further pointed to a substantial number of unrelated minority shareholders who could enforce these duties by suit.

The fiduciary duties present in United States v. Byrum, 408 U.S. 125 (1972), ran to a significant number of unrelated parties and had their genesis in operating businesses that would lend meaning to the standard of acting in the best interests of the entity. As a result, there existed both a realistic possibility for enforcement and an objective business environment against which to judge potential dereliction. Given the emphasis that the Supreme Court laid on these factual realities, Byrum simply does not require blind application of its holding to scenarios where the purported fiduciary duties have no comparable substance. We therefore analyze the situation before us to

determine whether the fiduciary duties relied upon by the estate would genuinely circumscribe use of powers to designate.

The estate summarizes its contentions regarding fiduciary duties as follows:

> Just like Mr. Byrum, Mr. Strangi's "rights" (whatever those rights appear to be) were severely limited by the fiduciary duties of other people who (according to Byrum) presumably could be counted on the [sic] observe those restraints against whatever desires they might otherwise have had to run pell-mell to do the bidding of the Decedent: (1) Mr. Gulig, who (separate and apart from his role as attorney-in-fact for Mr. Strangi) had fiduciary duties to Stranco, whom he served as manager; (2) the directors of Stranco, who had fiduciary duties to both Stranco and to SFLP as a whole; and (3) McLennan County Community College ("MCCC"), which had rights as a minority shareholder of Stranco and a fiduciary obligation to enforce such rights for the benefit of its own beneficiaries as well as the people of the State of Texas (with the Attorney General of Texas having the ability to step in to enforce such rights if MCCC failed in its duties).
> * * *

None of the foregoing obligations cited by the estate is sufficiently on par with those detailed in United States v. Byrum, supra, to bring the present case within the Supreme Court's rationale.

Concerning Mr. Gulig, any fiduciary duties that Mr. Gulig might have had in his role as manager of Stranco (and thereby of SFLP) are entitled to comparatively little weight on these facts. Prior to his instigation of the SFLP/Stranco arrangement, Mr. Gulig stood in a confidential relationship, and owed fiduciary duties, to decedent personally as his attorney in fact. Thus, to

the extent that Stranco or SFLP's interests might diverge from those of decedent, we do not believe that Mr. Gulig would disregard his preexisting obligation to decedent.

As regards fiduciary obligations of Stranco and its directors, these duties, too, have little significance in the present context. Although Stranco would owe a fiduciary duty to SFLP and to the limited partners, decedent owned the sole, 99-percent limited partnership interest. The rights to designate traceable to decedent through Stranco cannot be characterized as limited in any meaningful way by duties owed essentially to himself. Nor do the obligations of Stranco directors to the corporation itself warrant any different conclusion. Decedent held 47 percent of Stranco, and his own children held 52 of the remaining 53 percent. Intrafamily fiduciary duties within an investment vehicle simply are not equivalent in nature to the obligations created by the United States v. Byrum, supra, scenario.

With respect to the role of MCC Foundation, United States v. Byrum, supra, affords no basis for permitting outcomes under section 2036(a)(2) to turn on factors amounting to no more than window dressing. A charity given a gratuitous 1-percent interest would not realistically exercise any meaningful oversight.

Lastly, we are unpersuaded that any different result should obtain on account of the Commissioner's having taken a contrary

position in certain previous administrative rulings.  As the estate repeatedly brings to our attention, the Commissioner has cited United States v. Byrum, supra, in such rulings for the principle that fiduciary constraints counsel against inclusion of family limited partnership assets under section 2036(a)(2).  See, e.g., Priv. Ltr. Rul. 94-15-007 (Apr. 15, 1994); Priv. Ltr. Rul. 93-10-039 (Mar. 12, 1993); Tech. Adv. Mem. 91-31-006 (Aug. 2, 1991).  These written determinations are expressly declared by statute to be without precedential force.  Sec. 6110(k)(3).  Thus, any claimed reliance on them is unavailing.  In any event, cursory exposition in limited factual circumstances does not preclude our analysis of statutory provisions and regulations in the context of this case.

In sum, the estate's averment that decedent's "'rights' * * * were severely limited by the fiduciary duties of other people who (according to Byrum) presumably could be counted on * * * [to] observe those restraints" rests on a faulty legal premise and ignores factual realities.  First, the Supreme Court's opinion in United States v. Byrum, supra, provides no basis for "presuming" that fiduciary obligations will be enforced in circumstances divorced from the safeguards of business operations and meaningful independent interests or oversight.  Second, the facts of this case belie the existence of any genuine fiduciary impediments to decedent's rights.  We conclude that the

value of assets transferred to SFLP and Stranco is includable in decedent's gross estate under section 2036(a)(2).

D. Existence of Consideration

Having decided that decedent retained an interest in the assets transferred to SFLP and Stranco for purposes of section 2036(a), we evaluate whether the statute's application may nonetheless be avoided on the basis of the parenthetical exception for "a bona fide sale for an adequate and full consideration in money or money's worth". Availability of the exception rests on two requirements: (1) A bona fide sale, meaning an arm's-length transaction, and (2) adequate and full consideration. See Estate of Harper v. Commissioner, T.C. Memo. 2002-121. The situation before us meets neither of these criteria.

First, no bona fide sale, in the sense of an arm's-length transaction, occurred in connection with decedent's transfer of property to SFLP and Stranco. Mr. Gulig, as decedent's attorney in fact, prepared the arrangement using Fortress materials in absence of any meaningful negotiation or bargaining with other anticipated interest-holders. He determined how the entities would be structured and operated, what property would be contributed, and what interests various parties would obtain therein. Hence, decedent essentially stood on both sides of the transaction, a fact unchanged by the manner in which the Strangi

children opted to join after the substantive decisions had been made.

Second, full and adequate consideration does not exist where, as here, there has been merely a "recycling" of value through partnership or corporate solution.  See Estate of Thompson v. Commissioner, T.C. Memo. 2002-246; Estate of Harper v. Commissioner, supra; Kimbell v. United States, 244 F. Supp. 2d 700 (N.D. Tex. 2003).  As we recently explained in Estate of Harper v. Commissioner, supra:

> to call what occurred here a transfer for consideration within the meaning of section 2036(a), much less a transfer for an adequate and full consideration, would stretch the exception far beyond its intended scope. In actuality, all decedent did was to change the form in which he held his beneficial interest in the contributed property. * * * Without any change whatsoever in the underlying pool of assets or prospect for profit, as, for example, where others make contributions of property or services in the interest of true joint ownership or enterprise, there exists nothing but a circuitous "recycling" of value.  We are satisfied that such instances of pure recycling do not rise to the level of a payment of consideration.  To hold otherwise would open section 2036 to a myriad of abuses engendered by unilateral paper transformations.

We see no distinction of consequence between the scenario analyzed in Estate of Harper v. Commissioner, supra, and that of the present case.  Decedent contributed more than 99 percent of the total property placed in the SFLP/Stranco arrangement and received back an interest the value of which derived almost exclusively from the assets he had just assigned.  Furthermore, the SFLP/Stranco arrangement patently fails to qualify as the

sort of functioning business enterprise that could potentially inject intangibles that would lift the situation beyond mere recycling. Cf. Estate of Harrison v. Commissioner, T.C. Memo. 1987-8; Church v. United States, 85 AFTR 2d 2000-804, 2000-1 USTC par. 60,369 (W.D. Tex. 2000), affd. without published opinion 268 F.3d 1063 (5th Cir. 2001) (both involving contributions by other participants not de minimis in nature, for a genuine pooling of interests). We therefore hold that decedent did not engage in any transfer for consideration upon the creation and funding of SFLP and Stranco. Accordingly, the estate is entitled to no exception to the treatment mandated by section 2036(a).

## II. Amount Includable

With respect to the amount includable in decedent's gross estate on account of a retained interest, the estate makes the following assertion:

> I.R.C. sec. 2036(a) only requires inclusion of property in a decedent's estate to the extent that the decedent retained an interest in the transferred property. Assuming arguendo that Decedent did retain an interest in some of the property transferred to SFLP, I.R.C. sec. 2036 does not automatically require inclusion of all of the property transferred by Decedent to SFLP and Respondent has not sustained his burden of proof of establishing the extent, if any, of any retained interest.

The foregoing premise, however, rests on a faulty understanding of the statute's operation. As we recently explained in Estate of Thompson v. Commissioner, supra:

Section 2036(a) effectively includes in the gross estate the full fair market value, at the date of death, of all property transferred in which the decedent had retained an interest, <u>rather than the value of only the retained interest</u>. <u>Fidelity-Philadelphia Trust Co. v. Rothensies</u>, 324 U.S. 108 (1945). This furthers the legislative policy to "include in a decedent's gross estate transfers that are essentially testamentary--i.e., transfers which leave the transferor a significant interest in or control over the property transferred during his lifetime." <u>United States v. Estate of Grace</u>, 395 U.S. 316, 320 (1969). Thus, an asset transferred by a decedent while he was alive cannot be excluded from his gross estate unless he "absolutely, unequivocally, irrevocably, and without possible reservations, parts with all of his title and all of his possession and all of his enjoyment of the transferred property." <u>Commissioner v. Estate of Church</u>, 335 U.S. 632, 645 (1949). * * * [Emphasis added.]

Regulations further detail that "If the decedent retained or reserved an interest or right with respect to a part only of the property transferred by him, the amount to be included in his gross estate under section 2036 is only a corresponding proportion". Sec. 20.2036-1(a), Estate Tax Regs. Accordingly, caselaw and regulatory authority converge to indicate that the full value of transferred property is includable unless there existed some specific portion of the contributed assets that the retained interest or rights could not reach.

Here, the record reveals that no part of the transferred property was exempt from the rights or enjoyment retained by decedent. The relevant documents make no distinction among the various assets contributed, nor does the evidence reflect that Mr. Gulig looked to particular assets in determining whether

amounts should be distributed.  The preponderance of the evidence therefore establishes that the full value of the transferred assets is includable under section 2036(a).

Pursuant to section 2036(a), 99 percent of the net asset value of SFLP and 47 percent of the value of assets held by Stranco should be included in decedent's gross estate. Nonetheless, because respondent never asserted an increased deficiency in connection with the section 2036 issue, valuation of the property in dispute, i.e., interests in SFLP and Stranco, will be limited by the amounts determined in the notice of deficiency.  The decision to be entered, however, will take into account any additional deductions to which the estate is entitled for costs and expenses incurred subsequent to the initial trial of this case.

To reflect the foregoing,

Decision will be entered under Rule 155.