T.C. Memo. 2005-126


UNITED STATES TAX COURT



ESTATE OF CHARLES PORTER SCHUTT, DECEASED,
CHARLES P. SCHUTT, JR., AND HENRY I. BROWN III, CO-EXECUTORS,
Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 19208-02.              Filed May 26, 2005.


        S1 and S2, Delaware business trusts, were formed
in 1998 and were capitalized by the contribution
thereto of stock by D through a revocable trust and by
WTC as trustee of various trusts created for the
benefit of D's children and grandchildren.  At his
death in 1999, D held through the revocable trust a
45.236-percent interest in S1 and a 47.336-percent
interest in S2.

        <u>Held</u>:  D's transfers of stock to S1 and S2 were
bona fide sales for adequate and full consideration
within the meaning of secs. 2036(a) and 2038, I.R.C.,
such that the value of the transferred assets is not
included in his gross estate under these statutes.


        <u>John W. Porter</u>, <u>W. Donald Sparks II</u>, and <u>Michael R. Stein</u>,
for petitioner.

        <u>Gerald A. Thorpe</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

WHERRY, <u>Judge</u>:  By a statutory notice dated October 11, 2002, respondent determined a Federal estate tax deficiency in the amount of $6,113,583.03 with respect to the estate of Charles Porter Schutt (the estate).  By answer, respondent asserted an increase in the deficiency of $1,409,884.65.  Thereafter, by amendment to answer, respondent asserted a further increase in the deficiency of $3,595,513.32 (for a total deficiency of $11,118,981).  After concessions, the principal issue for decision is whether the fair market value of stock contributed by Charles Porter Schutt (decedent) through a revocable trust to Schutt, I, Business Trust (Schutt I) and Schutt, II, Business Trust (Schutt II) is includable in his gross estate pursuant to section 2036(a) or 2038.[1]

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of the parties, with accompanying exhibits, are incorporated herein by this reference.  Decedent was a resident of the State of Delaware when he died testate on April 21, 1999, and his will was probated in that State.  The co-executors of

---

[1] Unless otherwise indicated, section references are to the Internal Revenue Code (Code) in effect as of the date of decedent's death, and Rule references are to the Tax Court Rules of Practice and Procedure.

decedent's estate both resided in the Commonwealth of
Pennsylvania at the time the petition in this case was filed.

General Background

Decedent was born on February 11, 1911. Decedent later
married Phyllis duPont (Mrs. Schutt), the daughter of Eugene E.
duPont (Mr. duPont). Decedent and Mrs. Schutt had four children,
each of whom subsequently married: Sarah Schutt Harrison,
Caroline Schutt Brown, Katherine D. Schutt Streitweiser, and
Charles P. Schutt, Jr. Decedent's son Charles P. Schutt, Jr.,
and his son-in-law Henry I. Brown III are the co-executors of his
estate. Each of decedent's four children had children of his or
her own, such that decedent and Mrs. Schutt were survived by 14
grandchildren.

Historically, a significant portion of the Schutt family
wealth has been invested in, and a concomitant significant and
steady portion of the family income has been generated by, an
interest in E. I. du Pont de Nemours and Company (DuPont) stock
and Phillips Petroleum Company stock initially obtained from
Mr. duPont. Throughout the decades, Mr. duPont, decedent, and
Mrs. Schutt have, in the administration of these and other
holdings, established a number of trusts for the benefit of
themselves and/or their issue.[2] In the mid-1980s, the Schutt

---

[2] Various trusts directly pertinent to the instant
litigation are described in detail infra in text. Decedent
(continued...)

family's holdings in Phillips Petroleum stock were sold, due to dissatisfaction with the management of Phillips Petroleum, and were replaced with stock in Exxon Corporation.

Trust 3044

During 1940, Mr. duPont as trustor and Wilmington Trust Company (WTC) as trustee entered into a trust agreement dated December 30, 1940 (Trust 3044).  In accordance with this agreement, shares of DuPont and Christiana Securities Company[3] stock were placed in trust for the benefit of Mrs. Schutt and her issue.  As pertinent here,[4] Trust 3044 provided that, until Mrs. Schutt's death, income was to be distributed quarterly to her issue per stirpes, or if none to Mrs. Schutt.

Upon Mrs. Schutt's death, the trust corpus was to be divided into shares, per stirpes, for the benefit of her issue.  If such share was set aside for a living child of Mrs. Schutt, the corpus so allocated was to be held in trust for the child and income

---

[2](...continued)
and/or Mrs. Schutt also established at least three additional trusts during the 1970s for the benefit of their grandchildren and the issue of their grandchildren.

[3] Christiana Securities Company was a holding company established by certain branches of the duPont family to hold DuPont stock.  The company was later merged into DuPont, and at times relevant to this proceeding, the corpus of Trust 3044 (or subtrusts thereunder) included DuPont and Exxon stock.

[4] The following explanations in text of the various trusts pertinent to this litigation are intended to serve as summaries of the most salient provisions.  The recitations do not attempt to set forth every feature and/or contingency.

therefrom was to continue to be distributed in quarterly installments to the child. Upon the child's death, the trustee was to distribute the corpus free of trust to the child's descendants, per stirpes, subject to specified age restrictions.

As regards administration, Trust 3044 granted to the trustee, subject to specified limitations, "in general, the power to do and perform any and all acts and things in relation to the trust fund in the same manner and to the same extent as an individual might or could do with respect to his own property." Concerning limitations, the trust agreement provided for the appointment of an "adviser of the trust" (also referred to herein as a "consent adviser") by Mrs. Schutt and stated that enumerated powers granted to the trustee shall be exercised

> only with the written consent of the adviser of the trust; provided, however, that if at any time during the continuance of this trust there shall be no adviser of the trust, or if the adviser of the trust shall fail to communicate in writing to Trustee his or her consent or disapproval as to the exercise of any of the aforesaid powers for which exercise the consent of such adviser shall be necessary, within twenty days after Trustee shall have sent to the adviser of the trust, by registered mail, at his or her last known address, a written request for such consent, then Trustee is hereby authorized and empowered to take such action in the premises as it, in its sole discretion, shall deem to be for the best interest of any beneficiary of this trust.

The specified powers subject to the above consent provision were the trustee's authority: (1) To sell or otherwise dispose of trust property; (2) to hold cash uninvested or to invest in

income-producing property; (3) to vote shares of stock held by the trust; and (4) to participate in any plan or proceeding with respect to rights or obligations arising from ownership of any security held by the trust.

The trust agreement recited that any trust established thereunder would terminate no later than 21 years after the death of the last survivor of Mr. duPont, his then-living issue, and his sons-in-law. At that juncture, any remaining principal was to be distributed free of trust to the income beneficiaries thereof at the time of the termination.

By a letter to WTC dated March 11, 1941, Mrs. Schutt appointed Mr. duPont and decedent as advisers of Trust 3044. The letter further stated that upon the death of either appointee, the survivor would act as sole adviser until such time as Mrs. Schutt appointed another adviser. Mr. duPont died on December 17, 1966, and decedent remained as sole adviser with respect to Trust 3044 and trusts created thereunder, a position he continued to hold at the time of his own death on April 21, 1999.

Mrs. Schutt died on August 5, 1989. Upon her death, Trust 3044 was divided into separate trusts for the benefit of her four children. These trusts are referred to as Trusts 3044-1, 3044-2, 3044-3, 3044-4, 3044-5, 3044-6, 3044-7, and 3044-8.

Decedent's and Mrs. Schutt's daughter Katherine D. Schutt Streitweiser died of leukemia on March 27, 1993. At that time, she was the current beneficiary of Trusts 3044-3 and 3044-7. In accordance with the provisions of those trusts, the assets held therein were distributed outright to her children.

Trust 2064

Mrs. Schutt's death was also significant with respect to the structure of two additional trusts directly pertinent to this litigation. By means of a trust agreement dated October 6, 1934, between Mr. duPont and WTC, Mr. duPont conferred upon Mrs. Schutt a limited power of appointment over what is referred to as Trust 2064. Under her will dated December 1, 1988, as amended by a first codicil dated January 25, 1989, Mrs. Schutt exercised this power of appointment. These documents provided that the property subject to the power was to be held in trust by WTC. At Mrs. Schutt's death and after the distribution of $1,000 to each of her surviving children, the balance of the trust was to be divided into shares, with one share set aside for each surviving grandchild and one share set aside for the then-living issue (as a group) of any grandchild who predeceased her but left surviving issue.

Any share set aside for a predeceased grandchild was to be distributed free of trust to that grandchild's issue, per stirpes, subject to the minor's trust provision set forth in the

will.  The shares set aside for grandchildren who survived Mrs. Schutt were to be held as a single trust, from which net income was to be distributed quarterly in equal shares to each grandchild until the youngest such grandchild achieved the age of 40.  Trust 2064 was to terminate on the earlier of (1) the date the youngest grandchild living at Mrs. Schutt's death reached 40, (2) the death of all grandchildren living at Mrs. Schutt's death, or (3) the date 21 years after the death of the last survivor of the issue of Mrs. Schutt's grandfather, Alexis Irenee duPont, living on October 6, 1934.  Trust property remaining at termination was to be distributed, if any such persons survived, in equal shares to the income beneficiaries thereof.

As pertains to the administration of Trust 2064, Mrs. Schutt's will provided a representative listing of powers granted to the trustee, subject to specified limitations.  More specifically, the will provided for an adviser of the trust (also referred to herein as a "direction adviser"), and appointed decedent as the initial direction adviser, a position he continued to hold until his death.  A committee made up of Mrs. Schutt's daughter-in-law Katherine Draper Schutt and son-in-law Henry I. Brown III was designated to succeed decedent in this role.  Regarding the direction adviser, the will stated, in relevant part:

> I direct the trustee of each trust created in this
> Will to exercise the powers granted to it * * *,

relating to buying, selling, leasing, exchanging, mortgaging, or pledging property held in such trust, and participation in incorporations, reorganizations, consolidations, liquidations, or mergers, only upon the written direction of the advisor of such trust or of the Committee, as the case may be.

\* \* \* \* \* \* \*

Notwithstanding the previous provisions of this Article, if at any time during the administration of any trust hereunder, the advisor or Committee fail to communicate in writing to Trustee any direction or disapproval with respect to Trustee's exercise of any power requiring the direction of the advisor or Committee within fifteen (15) days after trustee has sent a written request for such direction to the advisor's or Committee members' last known address by registered or certified mail (but Trustee shall not be required to take the initiative to seek any such direction), then Trustee is authorized to take such action in the matter as it, in its sole discretion, deems appropriate.

The will further directed that the direction adviser and Committee members exercise their functions in a fiduciary capacity.

Trust 11258-3

As previously indicated, Mrs. Schutt's death was also significant with respect to the structure of a second trust directly relevant to the factual background of this proceeding. On January 16, 1976, Mrs. Schutt had established a revocable trust, which was subsequently amended by supplemental trust agreements dated April 9, 1976, June 6, 1979, December 30, 1982,

and December 1, 1988.[5]  At Mrs. Schutt's death, following payment

of certain cash bequests, the corpus of the revocable trust was

divided into three trusts:  (1) A marital trust; (2) a

generation-skipping transfer tax exemption trust (GST trust); and

(3) a residuary trust.  WTC became trustee of these trusts, the

GST portion of which is also referred to as Trust 11258-3.

The marital trust was to be funded with the "marital

deduction amount", an amount which, taking into account

applicable provisions of the Code, resulted in a taxable estate

of $2.5 million, less the amount of any adjusted taxable gifts.

During decedent's life, he was to receive net income therefrom

and so much of principal as he requested.  At his death,

remaining corpus was to be distributed according to the exercise

of a power of appointment granted to decedent.  In absence of an

exercise of this power, and after taking into account specified

provisions relating to payment of taxes and expenses, remaining

marital trust assets were to be added to the residuary trust.

The GST trust was to be funded with property equal in value

to the maximum amount then available to Mrs. Schutt under the

generation-skipping transfer tax exemption set forth in the Code.

The trustee was authorized, in its sole discretion, to distribute

---

[5] One of the parties' stipulations contains a mistaken reference to the date of the final supplemental trust agreement as Sept. 1, 1998.  Elsewhere in the same stipulation, as well as in the accompanying exhibit, the correct date of Dec. 1, 1988, is reflected.

net income and principal to Mrs. Schutt's issue more remote than children for their support, maintenance, education, care, and welfare. The GST trust was to terminate 110 years after becoming irrevocable, at which time the property was to be distributed free of trust to Mrs. Schutt's then-living issue, per stirpes.

The remaining assets of the revocable trust were to be placed into the residuary trust. A share of the residuary trust was set aside for each of Mrs. Schutt's four children. Subject to certain differences not material here, each child was given a lifetime income interest in, and a limited testamentary power of appointment over, his or her share. In default of any such appointment by the child, the trustee was directed upon the child's death to distribute the assets free of trust to the child's then-living issue, per stirpes. Mrs. Schutt's son, Charles P. Schutt, Jr., was also authorized to withdraw up to one-third of the value of his share upon request.

With respect to administration, the trust indenture provided for powers to the trustee and a direction adviser or committee in terms substantially identical to those contained in Trust 2064. Mrs. Schutt was named as the initial direction adviser. She was succeeded at her death in that role by decedent, a position he held until his own death. Katherine Draper Schutt and Henry I. Brown III were again named as the members of the committee to succeed decedent.

Revocable Trust

Like Mrs. Schutt, decedent on January 16, 1976, had established a revocable trust, subsequently amended by supplemental trust agreements dated April 9, 1976, June 6, 1979, December 30, 1982, December 1, 1988, January 24, 1989, July 18, 1989, April 6, 1990, May 4, 1994, May 20, 1994, December 10, 1996, and May 21, 1997 (Revocable Trust). The Revocable Trust was initially funded with life insurance policies on decedent's life and with various holdings in common stock. Decedent, Henry I. Brown III, and Charles P. Schutt, Jr., were named as co-trustees, positions they held until decedent's death, at which time Henry I. Brown III and Charles P. Schutt, Jr., continued as successor co-trustees.

As amended, the trust agreement made the following provisions with respect to distributions. During decedent's life, he was to receive all net income of the trust and so much of the principal as he requested in writing at any time. At decedent's death, specified cash bequests were to be made to named beneficiaries. Remaining corpus was to be divided into three trusts: (1) A charitable lead trust; (2) a so-called special trust; and (3) a residuary trust.

The charitable lead trust provided for a charitable lead unitrust term beginning on the date of decedent's death and terminating 25 years thereafter, and for a unitrust amount to

charity annually of 5 percent of the value of the trust assets. The total value of the trust fund was to be an amount which would produce a charitable deduction for the charitable lead trust sufficiently large to leave a taxable estate equal to decedent's unused generation-skipping transfer tax exemption. At the termination of the charitable interest, specified amounts were to be distributed to grandchildren born after Mrs. Schutt's death and to then-living issue of any predeceased grandchild.

Assets not distributed under the just-described provisions were to be held in trust and to be paid at the sole discretion of the trustee for the support, maintenance, education, care, and welfare of then-living grandchildren of decedent and then-living issue of any grandchild dying prior to the termination of the charitable lead. This trust was to terminate upon the earlier of the death of decedent's last-surviving grandchild or 110 years after decedent's death. At that time, the corpus was to be distributed outright, per stirpes, to decedent's then-living great-grandchildren and to issue of any predeceased great-grandchild.

The special trust was to be created by setting aside $2 million. Until the death of the last to die of decedent's children, income could be paid to any then-living child in the discretion of the trustee, so long as the trustee was not a child of decedent. Following the death of the last to die of

decedent's children, the trustee was to pay annually to the University of Virginia an annuity equal to 4 percent of the value of the special trust on the date of the last child's death. Throughout the trust's term, principal could be used for the full-time undergraduate college tuition of the issue of any of decedent's children.  Unless earlier exhausted, the special trust was to terminate 90 years after the death of the last grandchild living at decedent's death, at which time the corpus was to be distributed free of trust to the University of Virginia.

The remaining assets of the revocable trust were to be placed into the residuary trust.  A share of the residuary trust was to be set aside for each of decedent's three living children and the issue per stirpes of his predeceased daughter.  Each primary beneficiary was given a lifetime income interest in, and a limited testamentary power of appointment over, his or her share.  In default of any such appointment, the trustee was directed upon the beneficiary's death to distribute the assets free of trust to the beneficiary's then-living issue, per stirpes.  Decedent's son was also authorized to withdraw principal not in excess of one-third of the value of his share upon request.

Schutt Family Limited Partnership

In addition to the foregoing trusts, decedent and two of his children, Charles P. Schutt, Jr., and Caroline Schutt Brown, on

December 23, 1994, created the Schutt Family Limited Partnership. On behalf of himself and the two children, decedent contributed to the partnership Alabama timberlands,[6] securities, and cash. In return for these contributions (or deemed contributions), the partners received units in the entity representing the following interests:

| | |
|---|---|
| Charles Porter Schutt: | 5-percent general partnership interest |
| | 82.112-percent limited partnership interest |
| Charles P. Schutt, Jr.: | 1-percent general partnership interest |
| | 5.444-percent limited partnership interest |
| Caroline Schutt Brown: | 1-percent general partnership interest |
| | 5.444-percent limited partnership interest |

Thereafter, decedent began making annual gifts of limited partnership interests, apparently intended to qualify for the exclusion under section 2503(b), to certain of his children, their spouses, and their children.

Decedent's Lifestyle and Health

At some time after his first wife's death and prior to May of 1994, decedent remarried, and he remained married to Greta Brown Layton-Schutt at the time of his death. During the 1995 through 1998 period, decedent led an active lifestyle. This

---

[6] Decedent had acquired interests in Alabama timberlands with two of his brothers-in-law during the 1960s. Portions of decedent's interests in the timberlands and related operations were placed in trust in 1971, see supra note 2, portions were used in funding the Schutt Family Limited Partnership, and still other portions continued to be owned outright by decedent at his death.

lifestyle included extensive traveling, boating, hunting, and socializing, and decedent remained at his residence in Wilmington, Delaware, only about 50 percent of the time. For instance, during the 1995 through 1998 period, decedent made regular visits to Vredenburgh, Alabama, to oversee both a working farm he owned there and Schutt family timberlands in the vicinity. He also traveled to, inter alia, England, Turkey, China, Russia, and Africa, and he spent a substantial amount of time cruising the Chesapeake Bay area on his yacht.

When at his home in Wilmington, decedent typically spent mornings during the work week at the Carpenter/Schutt family office[7] reviewing investment literature, followed by lunch at the Wilmington Club (a social club), followed by a return to the family office for additional investment research. Decedent subscribed to a buy and hold investment philosophy, as had his father-in-law, Mr. duPont.

This philosophy emphasized the acquisition of stock in quality companies that would provide both income and value appreciation, which would then be held for the long term. In particular, decedent, like Mr. duPont before him, stressed maintaining the family's large holdings in DuPont and, depending

---

[7] Mrs. Carpenter and Mrs. Schutt were both daughters of Mr. duPont. Since at least the early 1970s, the two families had maintained a joint family office with staff overseeing and assisting in business and personal matters for family members.

on the time frame and absent drastic circumstances, Phillips or Exxon.  Over the years, decedent also on numerous occasions expressed concern about family members selling DuPont or Exxon shares, and he was displeased with such sales made by grandchildren during the 1990s.

During the 1996 through 1998 period, decedent was under the regular care of his family physician and a cardiologist in Wilmington, Delaware, and of another family physician in Camden, Alabama.  Decedent's health history during the period included coronary artery disease, congestive heart failure, hyperlipidemia, hypertension, renal insufficiency, and gout.  On November 29, 1996, decedent was admitted to the hospital complaining of shortness of breath.  He was released on December 5, 1996, after receipt of fluids, monitoring, and adjustment of his medication.  He was also admitted briefly to a hospital in Camden, Alabama, on January 6, 1998, because of similar medical problems.

<u>Schutt I and II</u>

During late 1996 or early 1997, decedent and two of his principal advisers, Stephen J. Dinneen and Thomas P. Sweeney, began discussions concerning the transfer of assets out of the Revocable Trust to another investment vehicle.  Mr. Dinneen was a certified public accountant who was in charge of accounting and tax work and served as the office manager for the

Carpenter/Schutt family office.  Among other things, he advised Schutt family members on investment and business matters and had been employed by the family since 1973.  Mr. Sweeney, a member of the law firm Richards, Layton & Finger, P.A., during this period served as decedent's attorney on tax and estate planning matters. Decedent had been a client of Mr. Sweeney since 1967.

Among the considerations providing an impetus for this potential restructuring of decedent's assets, Mr. Sweeney and/or Mr. Dinneen recall discussing:  (1) Decedent's concerns regarding sales by family members of core stockholdings and his desire to extend and perpetuate his buy and hold investment philosophy over family assets; (2) the need to develop another vehicle through which decedent could continue to make annual exclusion gifts due to exhaustion of available units in the family limited partnership for this purpose; and (3) the possibility of valuation discounts.  Following the initial discussions with decedent, Mr. Sweeney and Mr. Dinneen undertook to investigate possible alternative entity structures for decedent's assets. Over the course of the next 15 months, a process of meetings, discussions, and research, extensively documented in letters, memoranda, and notes, took place and culminated in the formation of Schutt I and II on March 17, 1998.

On January 27, 1997, Mr. Sweeney sent to Mr. Dinneen a letter enclosing a memorandum entitled "CONSIDERATIONS RELEVANT

IN CHOOSING BETWEEN A FAMILY LIMITED PARTNERSHIP, A LIMITED LIABILITY COMPANY, AND A DELAWARE BUSINESS TRUST".[8]  The memorandum first summarized characteristics, benefits, and problems associated with each entity, including potential transfer tax savings and the problem of being classified as an "investment company" within the meaning of section 721(b).  The second half of the memorandum was then devoted to a more extended discussion of valuation discounts for estate planning purposes. In the cover letter, Mr. Sweeney recommended use of "a Delaware business trust because this would avoid the implications of an investment company since what is to be transferred is a diversified portfolio of marketable securities being transferred by one person."  He also expressed general observations regarding the types of discounts that could be available "If Porter died owning a substantial portion of the interest" in the entity and noted the need for a qualified appraiser to determine the precise amount of the discount.

On February 3, 1997, Mr. Sweeney met with decedent and Mr. Dinneen to further discuss entity formation issues raised in the January 27 letter.  Upon reviewing the memorandum, Mr.

---

[8] During the 1997 to early 1998 period, a Delaware business trust was formed pursuant to the Delaware Business Trust Act, Del. Code Ann. tit. 12, secs. 3801-3822 (Supp. 2004).  Effective September 1, 2002, the Delaware Business Trust Act was replaced by the Delaware Statutory Trust Act, Del. Code Ann. tit. 12, secs. 3801-3826 (Supp. 2004).

Dinneen had come up with the idea of creating a Delaware business trust in which decedent held a minority interest and served as trustee, while the remaining interests would be held for the benefit of his children and grandchildren by WTC trusts of which decedent was the direction or consent adviser. The participants agreed to pursue this idea, and decedent authorized Mr. Sweeney to contact representatives of WTC to discuss the joint creation of a business trust. They also reviewed at the meeting a computation prepared by Mr. Dinneen reflecting the estimated difference in Federal estate tax and net inherited amount under decedent's current estate plan and under a plan where a portion of his assets would be placed into an entity subject to minority and marketability discounts.

In early February 1997, on decedent's behalf, Mr. Sweeney met with representatives of WTC to determine whether the company would consider being involved with decedent in forming a Delaware business trust and, if so, under what conditions. Specifically, on February 5, 1997, Mr. Sweeney met with George W. Helme IV, senior vice president and head of the trust department of WTC. Mr. Helme indicated that, in concept, the company was willing to participate, and he directed Mr. Sweeney to speak with the legal staff of the trust department regarding details. Mr. Sweeney reported these developments to decedent in a letter dated February 6, 1997.

On February 10, 1997, Mr. Sweeney sent a memorandum to Kathleen E. Lee, another attorney at his firm, asking her to research certain issues with respect to the potential business trust transaction. He also summarized therein as follows:

> The present concept that is being considered is that Porter would put up $40 million of his portfolio, and between trusts 2064 and 3044-5, 3044-6 and 3044-8, the Wilmington Trust Company would put up approximately $42 million. The net effect would be that Porter's funded revocable trust would then have a minority interest in the business trust, and possibly at Porter's death, we could obtain both lack of marketability and minority interest discounts with respect to Porter's interest in the Delaware business trust.

He further noted: "it is anticipated that Porter Schutt will at some time in the not too distant future after the transaction is implemented commence to give away to his children in the form of taxable gifts interests in the Delaware business trust."

Ms. Lee responded to the following four questions by memorandum dated March 5, 1997:

> 1. If our client and the Wilmington Trust Company contribute investment portfolios consisting of marketable securities into a Delaware Business Trust, would such contributions give rise to investment company status under § 721(b) of the Internal Revenue Code of 1986, as amended (the "Code") such that a realization of gain must be recognized upon the creation of the Delaware Business Trust?

> 2. Can the Delaware Business Trust make an election under § 754 of the Code to increase basis in the underlying assets of the Delaware Business Trust?

> 3. How should the Delaware Business Trust be structured so that the entity will continue after the death of our client?

4. What valuation discounts should be given for a minority interest and a lack of marketability in a Delaware Business Trust which consists solely of a portfolio of marketable securities?

During the period March through August 1997, Mr. Sweeney continued discussions with WTC concerning the formation of a Delaware business trust to hold certain of the assets of the WTC trusts and the Revocable Trust. These discussions began with a meeting that took place on March 4, 1997, between Cynthia L. Corliss, Mary B. Hickok, and Neal J. Howard, who attended the meeting on behalf of the trust department legal staff of WTC, and Mr. Sweeney. Subsequent to this meeting, Mr. Sweeney received a memorandum from Ms. Corliss, Ms. Hickok, and Mr. Howard, dated March 6, 1997, stating initial concerns of WTC regarding use of a business trust. Specifically, the memorandum expressed desire on the part of WTC: (1) To ensure that none of the WTC trusts would be subjected to tax on built-in capital gains attributable to sales of assets contributed by the Revocable Trust or any other WTC trust; (2) to structure the business trust so that WTC and decedent remained in the same relative positions as then enjoyed with respect to control over investment decisions; (3) to obtain consents from existing beneficiaries of the WTC trusts agreeing to formation of the business trust; and (4) to have all assets of the business trust held in a WTC custody account.

Thereafter, Mr. Sweeney and attorneys at his firm undertook to research and address the concerns raised by WTC. For

instance, at Mr. Sweeney's direction, Cynthia D. Kaiser analyzed

potential securities law issues attendant to the proposed

transaction and Julian H. Baumann, Jr., researched partnership

income tax matters broached in WTC's March 6, 1997, memorandum.

In addition, discussions and negotiations between Mr. Sweeney and

WTC representatives, in which Mr. Howard took the lead role on

behalf of WTC, continued in the form of letters, telephone

conversations, and other meetings.  Mr. Sweeney and Mr. Dinneen

also communicated regularly about issues that arose, as phrased

in one letter, "in connection with our pursuing the Delaware

business trust for Porter and his family in order to make certain

that those entities with respect to which Porter has investment

responsibility are being managed in a consistent manner."

Decedent was likewise kept informed regarding the status of the

discussions and negotiations.  For example, a letter to decedent

from Mr. Sweeney, dated July 14, 1997, explained as follows:

> I apologize for the delay in getting to you this
> letter which outlines the structure for a Delaware
> business trust.  There are still a number of issues
> which need to be addressed and worked through with the
> Wilmington Trust Company, and we will proceed to have
> further discussions with them in this regard.
>
> The purpose of the Delaware business trust would
> be to have under one document all of the trust assets
> of which you are either the direction or consent
> investment advisor, including a substantial portion of
> your own portfolio presently held in your funded
> revocable trust.  In this manner, there could be a
> consistent investment policy with respect to the assets
> in which the Schutt family has an equitable interest

and thus provide a vehicle through which a more coordinated investment policy can be administered.

The first major issue which needs to be addressed and with respect to which hopefully Steve Dinneen can provide the detailed information from the Wilmington Trust Company reports from the various trusts is to make certain that going into a Delaware business trust does not create a taxable transaction. The critical thing is to make certain that the creation of the business trust does not constitute "an investment company" in the context of the pertinent provisions of the Internal Revenue Code. * * *

\* \* \* \* \* \* \*

Structurally, it would be proposed that you be named as the initial trustee of the Delaware business trust with perhaps the Wilmington Trust Company being the successor trustee, and that the business trust have perpetual existence which would not be terminated or revoked by a beneficial owner or other person except in accordance with the terms of its governing instrument. In addition, it should provide that death, incapacity, dissolution, termination or bankruptcy of a beneficial owner will not result in the termination or dissolution of the business trust except to the extent as otherwise provided in the governing instrument of the business trust.

We would propose that investment decisions would be those recommended by you, subject to review by the Wilmington Trust Company, and that your view would control based on the terms of the various trusts which would become participants.

In the event of termination of one of the trusts investing in the Delaware business trust occurs, then the assets which would be distributed to the persons entitled to the beneficial [sic] would be interests in the Delaware business trust which would continue in existence as noted above.

The issue raised in the March 6 Wilmington Trust Company memo pertaining to separate sections of the Delaware business trust so that certain trusts are not subject to a share of the capital gains generated by other sales is of concern because it appears that that

would be inconsistent with the normal treatment of investment partnerships for tax purposes.  * * *

In addition to the foregoing, we have examined certain federal and Delaware security law aspects of creating such a business trust.  There may be both state and federal filing requirements to consider. However, these requirements will be somewhat limited if it can be illustrated that each investor is a "credited investor,"  * * *

* * * * * * *

Once we are certain that you are in agreement with structuring the business trust as generally indicated above, then we will go back to the Wilmington Trust Company and try to work out with them in more detail the issues they have raised and the proposed solutions in connection therewith.

On August 27, 1997, Mr. Sweeney met with Mr. Dinneen and decedent to review whether, given the preliminary work completed to date, decedent was willing to proceed with the transaction. Decedent indicated a willingness to do so, but during the meeting, several points were emphasized:  (1) The trust should be structured so as to avoid the "investment company problem"; (2) decedent wished to be the trustee, with his son, son-in-law, and perhaps even their wives as successor trustees; (3) decedent wanted to ensure that fees to be received by WTC for serving as both trustee of the WTC trusts and custodian of the business trust assets would not result in "double dipping" and thereby exceed fees currently being charged; (4) the trust arrangement should be such that only precontribution gain, and not postcontribution gain, was allocated solely to the contributing

trust; and (5) decedent desired to retain final say on investment decisions, although WTC could be permitted some involvement.

Shortly thereafter, on September 4, 1997, Mr. Sweeney met with Mr. Howard and Ms. Hickok of WTC. The following issues were among those addressed at this conference. (1) With respect to the burden of capital gains tax on future asset sales, Mr. Howard and Ms. Hickok clarified that the concern previously raised focused on precontribution gain, and they agreed that operative partnership tax rules under section 704 resolved their concerns. (2) In connection with fulfilling fiduciary duties, Mr. Howard and Ms. Hickok indicated a desire to obtain consents from beneficiaries of various WTC trusts participating in the business trust transaction. (3) As to the investment company issue, the participants discussed the stock concentrations within the relevant portfolios and broached as a topic for further research whether contributing only DuPont stock to the business trust could avoid the problem. (4) Regarding the length of the trust's existence, the WTC representatives expressed interest in a 30- to 40-year term, while Mr. Sweeney suggested at least a 40- to 50-year term. (5) On the matter of investment decisions, Mr. Sweeney stressed that decedent wanted the trust structured so that he would have the final vote and control, to which Mr. Howard and Ms. Hickok ultimately agreed so long as WTC had some input. (6) Lastly, as to WTC's fees, Mr. Howard and Ms. Hickok

agreed that with respect to assets contributed by the WTC trusts, the combined custodian and trustee fees would not exceed current charges. However, they indicated that "new" fees would be charged for custody of stock contributed by decedent's Revocable Trust. Mr. Sweeney indicated that this issue would have to be analyzed further and negotiated.

Mr. Sweeney reported the foregoing to decedent in a letter dated September 5, 1997, and also on that date requested that Ms. Lee research certain of the issues raised. On September 22, 1997, Mr. Sweeney sent a further letter to decedent indicating that contribution of only DuPont stock to the business trust appeared, based on the research performed, to avoid the investment company problem. Mr. Sweeney asked decedent to consider whether proceeding on that basis would accomplish his objectives.

During late 1997, discussions continued between Mr. Sweeney and WTC representatives, with Mr. Sweeney making several proposals to address WTC concerns. In particular, following analysis by Mr. Dinneen of holdings of the various trusts, Mr. Sweeney proposed that, in order to avoid characterization as an investment company for income tax purposes under section 721(b), two separate business trusts be created. One would hold exclusively DuPont stock, and the other would hold only Exxon shares.

WTC, in a November 26, 1997, letter to Mr. Sweeney, ultimately agreed to structure the transactions as Mr. Sweeney proposed, subject to enumerated conditions: (1) WTC would have the opportunity to review the business trusts to ensure they were in a form satisfactory for WTC to proceed; (2) all adult beneficiaries of the WTC trusts would execute a consent form, to which a copy of the business trusts would be attached, "whereby they acknowledge and consent to the trusts' investing in the business trusts and that they recognize that the business trusts may last beyond the termination date of the trusts of which they are a beneficiary"; and (3) business trust assets would be placed in custody with WTC, with fees charged as set forth in an attached November 25, 1997, proposal.

Mr. Sweeney communicated these conditions to decedent, and negotiations continued with respect to the fee arrangement. For instance, decedent requested that the proposed fee agreement be amended: (1) To provide clearly that WTC's commissions as custodian of the business trust assets would not exceed the fees lost on trustee fees from the participating trusts, and (2) to address the ability of the trustee of the business trusts to change the custodian if WTC were to be acquired by another bank. WTC agreed to make changes addressing these concerns.

Also during December of 1997, drafts of the business trusts were prepared and circulated for comment amongst decedent, his

advisers, and WTC.  Mr. Sweeney had initially asked Ms. Lee to begin drafting the documents in a November 14, 1997, memorandum that set forth details regarding certain provisions to be included.  Regarding purpose, the memorandum stated:

> You will recall that the purpose of the two Delaware business trusts is to preserve and coordinate Porter Schutt's investment philosophy with respect to those trusts over which he has either direction or consent investment advice of which the Wilmington Trust Company is trustee, as well as his own funded revocable trust.  Over the years, Porter Schutt has developed a buy and hold philosophy which has been quite successful, and he is anxious to have that philosophy preserved for his family for the future.

In a January 6, 1998, telephone conversation, Mr. Howard pointed out, along with several minor drafting errors, what he considered to be a significant substantive problem with the provision then included in the trust documents regarding distributions.  The initial drafts of the trust stated that net cashflow would be distributed at such times and in such amounts as determined by the trustee in his discretion.  WTC wanted the trusts to provide for distribution of net cashflow at least annually.  Mr. Sweeney thought that quarterly distributions could accord with decedent's original intent, and the documents were revised to so provide, for further review by the participants.

By a letter dated January 9, 1998, WTC confirmed its agreement with the form and content of the Schutt I and Schutt II indentures, and work proceeded to prepare and finalize the beneficiary consent documents.  Like the trusts, the consents

were circulated for comment and revision. Mr. Sweeney sent a draft consent to decedent on January 23, 1998, under a cover letter summarizing the rationale for certain provisions, e.g.,

> we have included a recital to the effect that you will be contributing DuPont and Exxon stock out of your trust to the respective Business Trusts which clarifies that this is really a family matter and a method of preserving the investment philosophy you have developed which has been so successful for the family.

Mr. Howard subsequently suggested on behalf of WTC that the consents indicate the percentage of the participating trust's assets being contributed to the business trusts so that the beneficiaries would have a clearer understanding of the impact of the investments on their beneficial interests. Decedent agreed to this modification.

The finalized consent forms, accompanied by copies of the business trust agreements, were circulated to the beneficiaries for signature on February 12, 1998. The forms provided that the beneficiaries consented to the contribution of certain securities to the business trusts and released WTC and decedent "from any and all action, suits, claims, accounts, and demands * * * for or on account of any matter or thing made, done, or permitted by the Advisor or the Trustees in connection with the contribution of securities to the Business Trusts." All living beneficiaries of Trusts 2064, 3044-1, 3044-2, 3044-5, 3044-6, 3044-8, and 11253-3 executed the consent and release forms in February and early March of 1998.

The trust agreements for Schutt I and Schutt II were signed on March 11, 1998, by WTC as trustee for Trusts 2064, 3044-1, 3044-2, 3044-5, 3044-6, 3044-8, and 11258-3 and were signed on March 17, 1998, by decedent, Charles P. Schutt, Jr., and Henry I. Brown III as trustees of the Revocable Trust.  On or about March 30, 1998, a Form SS-4, Application for Employer Identification Number, was signed and thereafter filed with the Internal Revenue Service for each business trust.  Similarly, on April 1, 1998, a Certificate of Business Trust Registration for each Schutt I and Schutt II was filed with the Office of the Secretary of State for the State of Delaware.

Funding of the business trusts began in March of 1998 and establishment of a WTC account for each business trust, with the account for Schutt I holding the DuPont securities and the account for Schutt II holding the Exxon securities, was completed at least by mid-April.  The custody agreements for the business trusts were executed by decedent and a representative of WTC on April 1, 1998.  As a result of the funding, the following capital contributions were made, and proportionate percentage interests received, in Schutt I and Schutt II:

SCHUTT I

| Unit Holder | DuPont Shares | Monetary Value | Percentage Interest |
|---|---|---|---|
| Revocable Trust | 472,200 | $30,752,025.00 | 45.236 |
| Trust 2064 | 108,000 | 7,033,500.00 | 10.346 |
| Trust 3044-1 | 19,098 | 1,243,757.25 | 1.830 |
| Trust 3044-2 | 23,670 | 1,541,508.75 | 2.268 |
| Trust 3044-5 | 132,962 | 8,659,150.25 | 12.738 |
| Trust 3044-6 | 132,962 | 8,659,150.25 | 12.738 |
| Trust 3044-8 | 132,960 | 8,659,020.00 | 12.737 |
| Trust 11258-3 | 22,000 | 1,432,750.00 | 2.108 |
| Totals | 1,043,852 | 67,980,861.50 | 100 (rounded) |

SCHUTT II

| Unit Holder | Exxon Shares | Monetary Value | Percentage Interest |
|---|---|---|---|
| Revocable Trust | 178,200 | $11,237,737.50 | 47.336 |
| Trust 2064 | 156,000 | 9,837,750.00 | 41.439 |
| Trust 3044-5 | 11,418 | 720,047.63 | 3.033 |
| Trust 3044-6 | 11,418 | 720,047.63 | 3.033 |
| Trust 3044-8 | 11,418 | 720,047.63 | 3.033 |
| Trust 11258-3 | 8,000 | 504,500.00 | 2.125 |
| Totals | 376,454 | 23,740,130.39 | 100 (rounded) |

The values of the shares and resultant percentage interests were calculated based on the average of the high and low prices for the stock on March 17, 1998, the effective date of the business trust agreements.

At the time Schutt I and Schutt II were formed, decedent owned assets not contributed to the business trusts with a fair market value of approximately $30,000,000. These assets included, without limitation, marketable securities, Alabama

timberland, cattle, investments in partnerships, a one-third undivided interest in South Carolina real estate, residential real estate located in Delaware and Alabama, and tangible personal property.

The trust agreements for Schutt I and Schutt II entered into as of March 17, 1998, were substantially identical and set forth the governing provisions for the entities. The agreements recited an intent to create a Delaware business trust, to be classified as a partnership for Federal income tax purposes. The stated purpose of the trusts was

> to engage in any lawful act or activity for which business trusts may be formed under the Act [Delaware Business Trust Act, Del. Code Ann. tit. 12, secs. 3801-3822], including the ownership and operation of every type of property and business, and the Trust may perform all acts necessary or incidental to the furtherance of such purpose.

The trust agreements were to be governed by and interpreted in accordance with the laws of the State of Delaware.

Decedent was named as the initial trustee, with his term to continue until his death, resignation, or adjudged incompetence. Charles P. Schutt, Jr., Henry I. Brown III, and Caroline S. Brown, in that order, were designated successor trustees. If none of the named successor trustees was able or willing to serve, an individual resident in the State of Delaware was to be selected by the vote of unit holders holding at least 66 percent of the interests in the trust.

As regards powers of the trustee, the agreements provided generally:

> Subject to the express limitations herein, the business and affairs of the Trust shall be managed by or under the direction of the Trustee, who shall have full, exclusive and absolute power, control and authority over the Property and over the business of the Trust. The Trustee may take any actions as in his or her sole judgment and discretion are necessary or desirable to conduct the business of the Trust. This Agreement shall be construed with a presumption in favor of the grant of power and authority to the Trustee. * * *

The agreements then enumerated specific powers, such as the ability to invest, transfer, dispose of, lend, and exercise voting and other ownership rights of trust property. The trustee was also expressly authorized to establish or change policies to govern the investment of trust assets.

Concerning capital contributions and accounts, the agreements stated that a capital account was to be maintained for each unit holder by crediting thereto the unit holder's capital contributions, distributive share of profits, and amount of any trust liabilities assumed, and by debiting the value of cash or other property distributed to the unit holder, the unit holder's distributive share of losses, and the amount of unit holder liabilities assumed by the trust. Profits and losses were generally to be allocated in proportion to the unit holders' interests in the entity, and allocations for tax purposes with respect to contributed property were to be made in accordance with section 704(c). Any return of a capital contribution, in

whole or in part, could be made only upon the consent of a majority in interest of the unit holders.

With respect to distributions, the trust agreements specified that "Net Cash Flow shall be distributed by the Trustee on or before the last day of each calendar quarter". "Net Cash Flow" was defined as gross cash receipts, less amounts paid by or for the account of the trust, less "any amounts determined by the Trustee, in his discretion, to be necessary to provide a reasonable reserve for working-capital needs or to provide funds for any other contingencies of the Trust." The distributions were to be made in accordance with the proportionate interests of the unit holders in the entity.

The agreements prohibited the sale, transfer, assignment, pledge, encumbrance, mortgage, or other hypothecation of any unit holder's interest, as well as withdrawal by a unit holder from the trust, without the consent of all unit holders. The stated term of the trusts was to extend until December 31, 2048, but the agreements provided that the term could be extended beyond that date with the written approval before December 31, 2048, of both the trustee and a majority in interest of the unit holders, or the trusts could be dissolved prior to that date upon the written consent of all unit holders. Upon dissolution and termination, the trusts were to be liquidated. Proceeds of the liquidation were to be disposed of first in payment to creditors of the

trusts, then for the establishment of any additional reserves deemed by the trustee to be reasonably necessary for any contingent liabilities, and then to unit holders in accordance with their capital account balances.

Regarding amendments, the trust agreements provided as a general rule that any amendment must be in writing and approved by holders of at least an aggregate 66-percent interest in the entity. Two modifications of this rule were likewise set forth. First, the trustee was authorized to amend the agreements without any unit holder's consent to (1) correct any patent error, omission, or ambiguity, and (2) add or delete any provision as necessary to attain and maintain qualification as a partnership for Federal income tax purposes or to comply with any Federal or State securities law, regulation, or other requirement. The second modification required the written consent of all unit holders to convert the trust to a general partnership or to change the liability of or reduce the interests in capital, profits, or losses of the unit holders. On a related point, the trust agreements specifically mandated 66 percent approval for transfer of any part of the trust corpus to another business trust, partnership, or corporation in exchange for an ownership interest in the entity and for merger or consolidation of the trust with another business entity.

Since the formation and funding of Schutt I and II, the net cashflow of each trust has been distributed pro rata on a quarterly basis, as required by the trust documents. The trusts have also filed annual Federal income tax returns reporting, inter alia, the pro rata distributive shares of income, credits, deductions, etc., allocated to each unit holder. Through at least the time of decedent's death, the trusts had never sold any of the DuPont or Exxon shares used to fund the entities, nor had they acquired any other assets.[9] Decedent's personal assets were not commingled with those of Schutt I or Schutt II.

Estate Tax Proceedings

As previously stated, decedent died on April 21, 1999, approximately 1 year after Schutt I and II were formed. A Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return, was filed on behalf of decedent on or about January 21, 2000. An election was made therein to use the alternate valuation date of October 21, 1999. The value reported for the gross estate on the Form 706 was $61,590,355.08, which included $15,837,295.45 and $7,237,104.56 for the Revocable Trust's interests in Schutt I and Schutt II, respectively. As of October

_____

[9] At trial, on direct examination, Mr. Dineen was asked: "And have either Schutt I or Schutt II sold DuPont stock?" He responded: "No." Although not free from ambiguity given that Schutt II held only Exxon stock, a reasonable inference from this testimony would appear to be that neither business trust had sold assets through the time of trial.

21, 1999, the underlying asset value of Schutt I was $65,273,495, of which the Revocable Trust's proportionate share was $29,527,314. The underlying asset value of Schutt II was $28,504,626, of which the Revocable Trust's proportionate share was $13,493,064.

In the notice of deficiency issued on October 11, 2002, respondent determined that the discounts applied in valuing the interests in Schutt I and Schutt II were excessive. The estate timely filed the instant proceeding challenging the statutory notice. By amendment to answer filed in this case, respondent then asserted an increased deficiency on the grounds that the full fair market value of the underlying assets contributed by the Revocable Trust to Schutt I and Schutt II should be included in decedent's gross estate under sections 2036(a) and 2038. The parties have since stipulated that if the Court rejects respondent's position under sections 2036 and 2038, they agree that the Schutt I and II units held by the Revocable Trust should be included in decedent's gross estate at the respective values of $19,930,937 and $9,107,818.

OPINION

I. Inclusion in the Gross Estate--Sections 2036 and 2038

   A. General Rules

As a general rule, the Code imposes a Federal excise tax "on the transfer of the taxable estate of every decedent who is a

citizen or resident of the United States." Sec. 2001(a). The taxable estate, in turn, is defined as "the value of the gross estate", less applicable deductions. Sec. 2051. Section 2031(a) specifies that the gross estate comprises "all property, real or personal, tangible or intangible, wherever situated", to the extent provided in sections 2033 through 2045 (i.e., subtitle B, chapter 11, subchapter A, part III of the Code).

Section 2033 states broadly that "The value of the gross estate shall include the value of all property to the extent of the interest therein of the decedent at the time of his death." Sections 2034 through 2045 then explicitly mandate inclusion of several more narrowly defined classes of assets. Among these specific sections is section 2036, which reads in pertinent part as follows:

SEC. 2036.  TRANSFERS WITH RETAINED LIFE ESTATE.

(a) General Rule.--The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death--

(1) the possession or enjoyment of, or the right to the income from, the property, or

(2) the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom.

Regulations further explain that "An interest or right is treated as having been retained or reserved if at the time of the transfer there was an understanding, express or implied, that the interest or right would later be conferred." Sec. 20.2036-1(a), Estate Tax Regs.

Given the language used in the above-quoted provisions, it has long been recognized that "The general purpose of this section is 'to include in a decedent's gross estate transfers that are essentially testamentary' in nature." Ray v. United States, 762 F.2d 1361, 1362 (9th Cir. 1985) (quoting United States v. Estate of Grace, 395 U.S. 316, 320 (1969)). The Supreme Court has defined as "essentially testamentary" those "transfers which leave the transferor a significant interest in or control over the property transferred during his lifetime." United States v. Estate of Grace, supra at 320. Accordingly, courts have emphasized that the statute "describes a broad scheme of inclusion in the gross estate, not limited by the form of the transaction, but concerned with all inter vivos transfers where outright disposition of the property is delayed until the transferor's death." Guynn v. United States, 437 F.2d 1148, 1150 (4th Cir. 1971).

As used in section 2036(a)(1), the term "enjoyment" has been described as "synonymous with substantial present economic benefit." Estate of McNichol v. Commissioner, 265 F.2d 667, 671

(3d Cir. 1959), affg. 29 T.C. 1179 (1958); see also Estate of Reichardt v. Commissioner, 114 T.C. 144, 151 (2000). Regulations additionally provide that use, possession, right to income, or other enjoyment of transferred property is considered as having been retained or reserved "to the extent that the use, possession, right to the income, or other enjoyment is to be applied toward the discharge of a legal obligation of the decedent, or otherwise for his pecuniary benefit." Sec. 20.2036-1(b)(2), Estate Tax Regs. Moreover, possession or enjoyment of transferred property is retained for purposes of section 2036(a)(1) where there is an express or implied understanding to that effect among the parties at the time of the transfer, even if the retained interest is not legally enforceable. Estate of Maxwell v. Commissioner, 3 F.3d 591, 593 (2d Cir. 1993), affg. 98 T.C. 594 (1992); Guynn v. United States, supra at 1150; Estate of Reichardt v. Commissioner, supra at 151; Estate of Rapelje v. Commissioner, 73 T.C. 82, 86 (1979). The existence or nonexistence of such an understanding is determined from all of the facts and circumstances surrounding both the transfer itself and the subsequent use of the property. Estate of Reichardt v. Commissioner, supra at 151; Estate of Rapelje v. Commissioner, supra at 86.

As used in section 2036(a)(2), the term "right" has been construed to "connote[] an ascertainable and legally enforceable

power". <u>United States v. Byrum</u>, 408 U.S. 125, 136 (1972).

Nonetheless, regulations clarify:

> With respect to such a power, it is immaterial (i) whether the power was exercisable alone or only in conjunction with another person or persons, whether or not having an adverse interest; (ii) in what capacity the power was exercisable by the decedent or by another person or persons in conjunction with the decedent; and (iii) whether the exercise of the power was subject to a contingency beyond the decedent's control which did not occur before his death (e.g., the death of another person during the decedent's lifetime). The phrase, however, does not include a power over the transferred property itself which does not affect the enjoyment of the income received or earned during the decedent's life. * * * Nor does the phrase apply to a power held solely by a person other than the decedent. But, for example, if the decedent reserved the unrestricted power to remove or discharge a trustee at any time and appoint himself as trustee, the decedent is considered as having the powers of the trustee. [Sec. 20.2036-1(b)(3), Estate Tax Regs.]

Additionally, retention of a right to exercise managerial power over transferred assets or investments does not in and of itself result in inclusion under section 2036(a)(2). <u>United States v. Byrum</u>, <u>supra</u> at 132-134.

An exception to the treatment mandated by section 2036(a) exists where the facts establish "a bona fide sale for an adequate and full consideration in money or money's worth".

Like section 2036, section 2038 provides for inclusion in the gross estate of the value of transferred property. Specifically, as pertinent here, section 2038(a)(1) addresses revocable transfers and requires inclusion of the value of property:

To the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, where the enjoyment thereof was subject at the date of his death to any change through the exercise of a power (in whatever capacity exercisable) by the decedent alone or by the decedent in conjunction with any other person (without regard to when or from what source the decedent acquired such power), to alter, amend, revoke, or terminate, or where any such power is relinquished during the 3-year period ending on the date of the decedent's death.

Regulations promulgated under the statute clarify that section 2038 does not apply:

(1) To the extent that the transfer was for an adequate and full consideration in money or money's worth (see § 20.2043-1);

(2) If the decedent's power could be exercised only with the consent of all parties having an interest (vested or contingent) in the transferred property, and if the power adds nothing to the rights of the parties under local law; or

(3) To a power held solely by a person other than the decedent. * * *  [Sec. 20-2038-1(a), Estate Tax Regs.]

B.  <u>Burden of Proof</u>

Typically, the burden of disproving the existence of an agreement regarding a retained interest has rested on the estate, and this burden has often been characterized as particularly onerous in intrafamily situations.  <u>Estate of Maxwell v. Commissioner</u>, <u>supra</u> at 594; <u>Estate of Reichardt v. Commissioner</u>, <u>supra</u> at 151-152; <u>Estate of Rapelje v. Commissioner</u>, <u>supra</u> at 86. In this case, however, the section 2036 and 2038 issues were not

raised in the statutory notice of deficiency and are therefore new matters within the meaning of Rule 142(a).  Thus, as respondent has conceded, the burden of proof is on respondent.

C.  <u>The Parenthetical Exception</u>

Sections 2036 and 2038 each contain an identical parenthetical exception for "a bona fide sale for an adequate and full consideration in money or money's worth".  Regulations promulgated under both sections reference the definition for this phrase contained in section 20.2043-1, Estate Tax Regs.  Secs. 20.2036-1(a), 20.2038-1(a)(1), Estate Tax Regs.  Section 20.2043-1(a), Estate Tax Regs., provides:  "To constitute a bona fide sale for an adequate and full consideration in money or money's worth, the transfer must have been made in good faith, and the price must have been an adequate and full equivalent reducible to a money value."

Availability of the exception thus rests on two requirements:  (1) A bona fide sale and (2) adequate and full consideration.  This Court has recently summarized when these requirements will be satisfied, as follows:

> In the context of family limited partnerships, the bona fide sale for adequate and full consideration exception is met where the record establishes the existence of a legitimate and significant nontax reason for creating the family limited partnership, and the transferors received partnership interests proportionate to the value of the property transferred. * * * The objective evidence must indicate that the nontax reason was a significant factor that motivated

the partnership's creation. * * * [Estate of Bongard v. Commissioner, 124 T.C. __, __ (2005) (slip op. at 39).]

Bona Fide Sale

The Court of Appeals for the Third Circuit, to which appeal in this case would normally lie, has emphasized that the bona fide sale prong will only be met where the transfer was made in good faith. Estate of Thompson v. Commissioner, 382 F.3d 367, 383 (3d Cir. 2004) (citing sec. 20.2043-1(a), Estate Tax Regs.), affg. T.C. Memo. 2002-246. In the context of family entities, the Court of Appeals set forth the following test: "A 'good faith' transfer to a family limited partnership must provide the transferor some potential for benefit other than the potential estate tax advantages that might result from holding assets in the partnership form." Id. Stated otherwise, "if there is no discernable purpose or benefit for the transfer other than estate tax savings, the sale is not 'bona fide' within the meaning of § 2036." Id. The Court of Appeals further indicated that while this test does not necessarily demand a transaction between a transferor and an unrelated third party, intrafamily transfers should be subjected to heightened scrutiny. Id. at 382.

The approach of the Court of Appeals for the Third Circuit correlates with this Court's requirement of a legitimate and significant nontax purpose for the entity. This Court has expressed this requirement using the alternate phraseology of an arm's-length transaction, in the sense of "the standard for

testing whether the resulting terms and conditions of a transaction were the same as if unrelated parties had engaged in the same transaction." Estate of Bongard v. Commissioner, supra at __ (slip op. at 46). Intrafamily or related-party transactions are not barred under this standard, but they are subjected to a higher level of scrutiny. Id. at __ (slip op. at 46-47).

In probing the presence or absence of a bona fide sale and corollary legitimate and significant nontax purpose, courts have identified various factual circumstances weighing in this analysis. These factors include whether the entity engaged in legitimate business operations, whether property was actually transferred to the entity, whether personal and entity assets were commingled, whether the taxpayer was financially dependent on distributions from the entity, and whether the transferor stood on both sides of the transaction. See, e.g., Estate of Thompson v. Commissioner, supra; Kimbell v. United States, 371 F.3d 257 (5th Cir. 2004); Estate of Bongard v. Commissioner, supra; Estate of Hillgren v. Commissioner, T.C. Memo. 2004-46; Estate of Stone v. Commissioner, T.C. Memo. 2003-309; Estate of Strangi v. Commissioner, T.C. Memo. 2003-145; Estate of Harper v. Commissioner, T.C. Memo. 2002-121.

Hence, in evaluating whether decedent's transfers to Schutt I and II are properly characterized as bona fide sales, the

essential task is to "separate the true nontax reasons for the [entities'] formation from those that merely clothe transfer tax savings motives." Estate of Bongard v. Commissioner, supra at __ (slip op. at 44). It must be recognized, however, that "Legitimate nontax purposes are often inextricably interwoven with testamentary objectives." Id. Furthermore, with respect to the particular case at bar, the Court must be cognizant of any potential divergence between decedent's actual motives and the concerns of his advisers.

The estate's position is that Schutt I and II were "formed primarily to put into place an entity to perpetuate Mr. Schutt's buy and hold investment philosophy with respect to the DuPont and Exxon stock belonging both to Mr. Schutt and to the Wilmington Trust Company Trusts." In service of this objective, Schutt I and II were aimed at "the furtherance and protection of * * * [decedent's] family's wealth by providing for the centralized management of his family's holdings in duPont [sic] stock and Exxon stock during his lifetime and to prevent the improvident disposition of this stock during his lifetime and to the extent possible after his death." The estate contends that the desired preservation of decedent's investment policy "could not be accomplished without the creation of Schutt I and Schutt II, as the WTC Trusts were scheduled to terminate at various intervals

and the assets of those trusts would be distributed, free of trust, to their respective beneficiaries."

Respondent's argument to the contrary is summarized as follows:

> (1) it was not necessary to transfer stock from Mr. Schutt's revocable trust to the business trusts to perpetuate his investment philosophy; (2) the record establishes that obtaining valuation discounts for gift and estate tax purposes was the dominant, if not the sole, reason for forming the business trusts; and (3) in any event, Mr. Schutt's desire to perpetuate his investment philosophy was itself a testamentary motive. * * *

The totality of the record in this case, when viewed as a whole, supports the estate's position that a significant motive for decedent's creation of Schutt I and II was to perpetuate his buy and hold investment philosophy. That decedent was in fact a committed adherent to the buy and hold approach is undisputed. His longstanding concern with disposition of core stockholdings by his descendants is also well attested. Mr. Sweeney testified that decedent "would raise, at least annually and, quite often, more than annually, his concern about the ability of children or grandchildren or whoever it might be to sell principal rather than using the income from the principal". Mr. Dinneen likewise testified that decedent expressed concern about Schutt family members' selling of stock from "Back in the early seventies and on a regular basis from there on out."

The documentary record also furnishes at least a measure of objective support for the decedent's willingness to act based on these worries. In 1994, decedent declined to make annual exclusion gifts of limited partnership interests in the Schutt Family Limited Partnership to his daughter Sarah S. Harrison and her children. The estate attributes this decision to concern about the investment philosophy of these individuals, and the limited evidence does reflect 13 occasions on which DuPont or Exxon stock was sold by Harrison grandchildren from 1989 through 1997.

Further corroborating the bona fides of the professed intent underlying creation of Schutt I and II is the fact that formation of the business trusts did serve to advance this goal. Respondent's contention that the business trusts were unnecessary to perpetuate decedent's investment philosophy unduly emphasizes management of the assets held by the Revocable Trust and minimizes any focus on the considerable assets held in the WTC trusts. Respondent points out that, under the Revocable Trust indenture, decedent could control investment decisions pertaining to the assets until his death, at which time various successor trusts to be administered by his son and son-in-law would be funded. Respondent argues that the situation under the business trusts was functionally equivalent, with decedent as trustee

setting investment philosophy during his lifetime, followed by his son and son-in-law as successor trustees.

However, by only considering the Revocable Trust assets in isolation, this analysis disregards more than half of the property involved in the business trusts.  Decedent in effect used the assets of the Revocable Trust[10] to enhance his ability to perpetuate a philosophy vis-a-vis the stock of the WTC trusts, such that none of the contributions should be disregarded in evaluating the practical implications of Schutt I and II. Mr. Howard testified that he did not believe he would have considered a proposal involving contribution only of the WTC trusts' assets to entities structured as were Schutt I and II, without decedent's willingness to place his own property alongside.  As Mr. Howard explained:  "it made real to me, certainly, when someone is willing to contribute that sum of money and tie it up the same way we were tying it up with respect to distributions, if not with respect to management, that this was something that he and the family, if they were willing to agree to it, felt strongly about."  This importance of decedent's contributions to those negotiating on behalf of WTC, at least on a psychological level, reflects a critical interconnectedness between decedent's contributions and those of the WTC trusts.

---

[10] To employ an oft-used metaphor, the assets of the Revocable Trust served essentially as leverage in the form of a carrot.

The effect of Schutt I and II on the assets of the WTC trusts shows that the business trusts advanced decedent's objectives in a meaningful way. Respondent's argument, however, to the extent that it takes into account the WTC assets, seeks to counter this conclusion by once again placing unwarranted emphasis on certain features or results of the structure to the exclusion of others. In discussing the alleged motive for involving the WTC trusts in the transaction, respondent states that "even if the decedent formed the business trusts to prevent his heirs from dissipating the family's wealth, this is itself a testamentary motive." More specifically, respondent dismisses the estate's contentions as follows:

> The decedent's testamentary motives are particularly evident in this case as it is clear that he was concerned about the dissipation of the family's wealth after his death as opposed to during his lifetime. While he was alive, he controlled the sale of stock held by his revocable trust. Similarly, as the direction or consent advisor to the bank trusts, none of the stock held by those entities could be sold without his consent. The only risk that assets held by the bank trusts could be sold without his consent was if one of his children predeceased him, thereby causing a distribution of a portion of the trust assets to that child's issue. Since his surviving children were all in good health when the business trusts were formed and the decedent was not, there is little doubt that the decedent was concerned about what would happen to the family's wealth after his death.

The Court disagrees that decedent's motives may properly be dismissed, in the unique circumstances of this case, as merely testamentary. The record on the whole supports that decedent's

greatest worry with respect to wealth dissipation centered on outright distribution of assets to the beneficiaries of the various WTC trusts. It is clear from the structures of the WTC trusts involved that outright distribution created the single largest risk to the perpetuation of a buy and hold philosophy, and testimony confirmed decedent's concern over a termination situation. Because none of the events that would trigger such a distribution turned on decedent's own death, to call the underlying motive testamentary is inappropriate.

Trust 2064, which contributed 10.346 percent of the DuPont stock to Schutt I and 41.439 percent of the Exxon stock to Schutt II, was to terminate, and the corpus was to be distributed free of trust to decedent's grandchildren, no later than when the youngest grandchild turned 40. Notably, the health of both decedent and his issue was irrelevant to this precipitating event. According to the parties' stipulations, decedent's youngest grandchild, Katherine D. Schutt, was 24 years of age at the time of decedent's 1999 death. The provisions of Trust 2064 would therefore dictate termination no later than the spring of 2015. Schutt I and II were structured to continue to 2048, absent agreement to the contrary in accordance with limited procedures set forth in the business trust indentures.

The Trust 3044 subtrusts, which in the aggregate contributed 42.310 percent of the DuPont stock to Schutt I and 9.099 percent

of the Exxon stock to Schutt II, specified that at the death of a primary beneficiary, one of decedent's children, the assets were to be distributed free of trust to the corresponding grandchildren. Respondent apparently seeks to belittle any concern decedent may have felt over these provisions by citing the good health of decedent's three surviving children, who were 61, 60, and 56 at the time of decedent's death. Yet respondent has offered no evidence contradicting the bona fides of decedent's fears in this regard. Nor is the Court prepared to say that decedent, who had already lost one child to cancer and observed firsthand the operation of the outright distribution mechanism, would be unjustified in taking steps to guard against this risk.

Still another aspect of the evidence in this case that corroborates decedent's desire to perpetuate his investment philosophy through establishment of Schutt I and II stems from WTC's concerns with and reactions to the proposed arrangement. The record indicates that WTC perceived the business trust transactions as having a meaningful economic impact on the rights of the beneficiaries of the WTC trusts. From early in the planning process, representatives of WTC consistently voiced concerns regarding the effect of the business trusts on liquidity.

Mr. Howard testified regarding the tone of the conversation when Mr. Helme first asked him to look into the possibility of participating in a business trust transaction: "It was a matter where we were going to take substantial portions of a series of trusts and put them into a business trust where we would not have the immediacy of control and liquidity that we had at the moment to meet the needs of the beneficiary. That's not an insignificant matter to review". Similarly, the initial March 6, 1997, memorandum from WTC to Mr. Sweeney memorializing issues of concern to WTC explained the impetus for obtaining consents from involved beneficiaries as follows:

> Each trust's interest in the DBT will be non-marketable for a period of time, perhaps beyond the termination of a trust. WTC would not normally invest marketable assets so as to cause them to become illiquid. The beneficiaries of the trust who are "sui juris" should, therefore, consent to this investment. To the extent these illiquidity concerns can be minimized by structuring the DBT so as to allow pro rata distributions on the occurrence of certain events, e.g., the death of one of Mr. Schutt's children, this should be done.[11]

Notes made by Mr. Sweeney of a September 4, 1997, meeting with decedent, Mr. Howard, and Ms. Hickok likewise reflect continued emphasis by WTC representatives on the need for beneficiary consent in conjunction with issues related to the duration of the business trusts. As a final example, in Mr. Howard's November

---

[11] The Court notes that this suggestion pertaining to distributions would manifestly have conflicted with decedent's objectives and was not incorporated.

26, 1997, letter agreeing to investment in Schutt I and II subject to three conditions, the condition pertaining to consent read:

> All of the beneficiaries of the various trusts who are of age will execute a form of consent whereby they acknowledge and consent to the trusts' investing in the business trusts and that they recognize that the business trusts may last beyond the termination date of the trusts of which they are a beneficiary. The form of the Delaware business trusts will be attached to the consents.

Mr. Howard testified that the latter requirement of the just-quoted condition was suggested and insisted upon by him to ensure that the consent given by the beneficiaries was meaningful.

Despite the evidence discussed above, it is nonetheless respondent's position that tax savings through valuation discounts constituted the dominant reason for formation of Schutt I and II. Respondent characterizes the issue of valuation discounts as having "dominated" the early discussions concerning the formation of a new entity. Respondent also notes that decedent and his advisers initially contemplated only transferring stock from the Revocable Trust to a business trust and emphasizes that the subsequent decision to involve the WTC trusts served a tax purpose of making available minority as well as marketability discounts. However, while it is clear that estate tax implications were recognized and considered in the initial stages of the planning process, the record fails to reflect that such issues predominated in decedent's thinking and

desires.  What may have originally been approached as a relatively routine estate planning transaction rapidly developed into an opportunity and vehicle for addressing more fundamental concerns of decedent.

As Mr. Sweeney and Mr. Dinneen acknowledged at trial, both had a background in tax and so would naturally have taken tax and valuation matters into account in any recommendations they made for decedent.  Yet the documentary evidence and testimony fall short of enabling the Court to infer that decedent himself was principally focused on tax savings.  To the contrary, the record compiled over the course of the ensuing year suggests otherwise.

The valuation questions evaluated by decedent's advisers in February and early March of 1997 were left virtually untouched throughout the remaining approximately 12 months of the planning and formation process.  Furthermore, to the extent that the notes taken by Mr. Sweeney of meetings involving decedent enable us to identify the particular concerns or comments emphasized by decedent himself, these concerns never touch on valuation discounts.  Rather, there is a notable focus on matters such as decedent's desire for investment control.  Additionally, in the letters sent by Mr. Sweeney to decedent for purposes of updating him on the progress of negotiations and presumably focusing on issues about which decedent would be most interested, transfer tax issues are nearly absent.  Thus, the proffered evidence is

insufficient to establish that estate tax savings were decedent's predominant reason for forming Schutt I and II and to contradict the estate's contention that a true and significant motive for decedent's creation of the entities was to perpetuate his buy and hold investment philosophy.

Given this conclusion regarding decedent's motive, the question then becomes whether perpetuation of a buy and hold investment strategy qualifies as a "legitimate and significant nontax reason" within the meaning of Estate of Bongard v. Commissioner, 124 T.C. at __ (slip op. at 39). As respondent points out, the buy and hold investment philosophy by definition resulted in passive entities designed principally to hold the DuPont and Exxon stock. Active management, trading, or "churning" of the portfolios as a means of generating profits was not intended. Furthermore, because each trust was funded with the stock of a single issuer, asset diversification did not ensue.

The Court of Appeals for the Third Circuit has in a similar vein suggested that the mere holding of an untraded portfolio of marketable securities weighs negatively in the assessment of potential nontax benefits available as a result of a transfer to a family entity. Estate of Thompson v. Commissioner, 382 F.3d at 380. As a general premise, this Court has agreed with the Court of Appeals, particularly in cases where the securities are

contributed almost exclusively by one person.  See Estate of
Strangi v. Commissioner, T.C. Memo. 2003-145; Estate of Harper v.
Commissioner, T.C. Memo. 2002-121.  In the unique circumstances
of this case, however, a key difference exists in that decedent's
primary concern was in perpetuating his philosophy vis-a-vis the
stock of the WTC trusts in the event of a termination of one of
those trusts.  Here, by contributing stock in the Revocable
Trust, decedent was able to achieve that aim with respect to
securities of the WTC trusts even exceeding the value of his own
contributions.  In this unusual scenario, we cannot blindly apply
the same analysis appropriate in cases implicating nothing more
than traditional investment management considerations.

To summarize, the record reflects that decedent's desire to
prevent sale of core holdings in the WTC trusts in the event of a
distribution to beneficiaries was real, was a significant factor
in motivating the creation of Schutt I and II, was appreciably
advanced by formation of the business trusts, and was unrelated
to tax ramifications.  The Court is thus able to conclude in this
case that Schutt I and II were formed for a legitimate and
significant nontax purpose without further probing the parties'
disagreement as to whether, in theory, an investment strategy
premised on buy and hold should offer just as much justification
for an entity premised thereon as a philosophy that focuses on
active trading.

As regards other factors considered indicative of a bona fide sale, these too tend to support the estate's position. The contributed property was actually transferred to Schutt I and II in a timely manner. Entity and personal assets were not commingled. Decedent was not financially dependent on distributions from Schutt I and II, retaining sufficient assets outside of the business trusts amply to support his needs and lifestyle. Nor was decedent effectively standing on both sides of the transactions.

Concerning this latter point, it is respondent's position that "there were no 'arm's-length negotiations' between the decedent and the bank concerning any material matters affecting the formation and operation of the business trusts." Respondent maintains that WTC, while ostensibly an independent third party, simply represented the interests of decedent's children and grandchildren and that decedent dictated all material terms.

The Court, however, is unpersuaded by respondent's attempts to downplay the give-and-take reflected in the record. As detailed in the facts recounted above and the stipulated exhibits, WTC representatives thoroughly evaluated the business trust proposals, raised questions, offered suggestions, and made requests. Some of those suggestions or requests were accepted or acquiesced in; others were not. Such a scenario bears the earmarks of considered negotiations, not blind accommodation.

There is no prerequisite that arm's-length bargaining be strictly adversarial or acrimonious.

Regardless of whether the Schutt I and II transactions should be subjected to the heightened scrutiny appropriate in intrafamily situations, the record here is sufficient to show that the negotiations and discussions were more than a mere facade.[12]  The Court concludes that the transfers to Schutt I and II satisfy the bona fide sale requirement for purposes of sections 2036 and 2038.

Adequate and Full Consideration

In this Court's recent discussion of the adequate and full consideration prong in Estate of Bongard v. Commissioner, 124 T.C. at __ (slip op. at 48-49), four factors were noted in support of a finding that the consideration requirement had been met:  (1) The interests received by the participants in the

---

[12] The Court also notes that Wilmington Trust Company (WTC) was founded in 1903 by the duPont family and has among its clients numerous duPont descendants.  According to public filings with the Securities and Exchange Commission, WTC subsequently became the principal operating and banking entity of Wilmington Trust Corporation, a financial holding company which as of Dec. 31, 1997, was publicly traded with 33,478,113 shares outstanding and 10,164 shareholders of record, had total assets of $6.12 billion, and possessed stockholders' equity of $503 million.  Given this size and scope, WTC's historical connection to the duPont family is not germane to our analysis.  Likewise, although Mr. Sweeney has served as a director of WTC and/or Wilmington Trust Corporation since 1983 and his firm has served as outside counsel to WTC, he during 1997 was one of 21 directors, and both Mr. Sweeney and Mr. Howard testified credibly that the relationship made the participants more circumspect, rather than less, in their dealings.

entity at issue were proportionate to the value of the property each contributed to the entity; (2) the respective assets contributed were properly credited to the capital accounts of the transferors; (3) distributions from the entity required a negative adjustment in the distributee's capital account; and (4) there existed a legitimate and significant nontax reason for engaging in the transaction. Given these circumstances, we concluded that the resultant discounted value attributable to entity interest valuation principles was not per se to be equated with inadequate consideration. Id. at __ (slip op. at 49-50).

The Court of Appeals for the Third Circuit has likewise opined that while the dissipated value resulting from a transfer to a closely held entity does not automatically constitute inadequate consideration for section 2036(a) purposes, heightened scrutiny is triggered. Estate of Thompson v. Commissioner, 382 F.3d at 381. To wit, and consistent with the focus of the Court of Appeals in the bona fide sale context, where "the transferee partnership does not operate a legitimate business, and the record demonstrates the valuation discount provides the sole benefit for converting liquid, marketable assets into illiquid partnership interests, there is no transfer for consideration within the meaning of § 2036(a)." Id.

In reaching this conclusion, the Court of Appeals referenced the "recycling" of value concept first articulated by this Court

in Estate of Harper v. Commissioner, T.C. Memo. 2002-121. Estate of Thompson v. Commissioner, supra at 378-381. As we explained with respect to the situation before us in Estate of Harper v. Commissioner, supra:

> to call what occurred here a transfer for consideration within the meaning of section 2036(a), much less a transfer for an adequate and full consideration, would stretch the exception far beyond its intended scope. In actuality, all decedent did was to change the form in which he held his beneficial interest in the contributed property. We see little practical difference in whether the Trust held the property directly or as a 99-percent partner (and entitled to a commensurate 99-percent share of profits) in a partnership holding the property. Essentially, the value of the partnership interest the Trust received derived solely from the assets the Trust had just contributed. Without any change whatsoever in the underlying pool of assets or prospect for profit, as, for example, where others make contributions of property or services in the interest of true joint ownership or enterprise, there exists nothing but a circuitous "recycling" of value. We are satisfied that such instances of pure recycling do not rise to the level of a payment of consideration. To hold otherwise would open section 2036 to a myriad of abuses engendered by unilateral paper transformations.

Respondent contends that the instant case features the genre of value recycling described in Estate of Harper v. Commissioner, supra, and subsequent cases such as Estate of Strangi v. Commissioner, T.C. Memo. 2003-145. Respondent, stressing that decedent enjoyed all incidents of ownership related to the contributed stock both before and after the transfers (e.g., the right to the income generated, the right to sell the stock and reinvest the proceeds, the right to vote the shares), maintains

that contribution to Schutt I and II engendered no meaningful change in decedent's relationship to the assets.

Again, however, this reasoning disregards unique factual circumstances present in this case that were not involved in Estate of Harper v. Commissioner, supra, and its progeny. Undoubtedly, looking in isolation at the relationship of a decedent to his or her assets may be sufficient where the decedent's contributions make up the bulk of the property held by the relevant entity and no suggestion of any benefit beyond change in form is evident. Yet here, where others contributed more than half of the property funding the entities and the record reflects that decedent used his own assets primarily to alter his relationship vis-a-vis those other assets, the analysis must look more broadly at the transactions. In that decedent employed his capital to achieve a legitimate nontax purpose, the Court cannot conclude that he merely recycled his shareholdings.

Furthermore, with respect to the additional criteria cited in Estate of Bongard v. Commissioner, supra at ___ (slip op. at 48-49), each participant in Schutt I and II received an interest proportionate in value to its respective contribution, the capital contributions made were properly credited to each transferor's capital account, and distributions required a negative adjustment in the distributee's capital account. Liquidating distributions would also be made in accordance with

capital account balances.  Hence, existing precedent shows that decedent is considered to have received adequate and full consideration as used in sections 2036(a) and 2038 for his transfers to Schutt I and II.

II.  Conclusion

The Court has concluded in the unique circumstances of this case that decedent's transfers to Schutt I and II constitute bona fide sales for adequate and full consideration for purposes of sections 2036(a) and 2038.  Because the record supports finding that both prongs of this test have been met, respondent has failed to carry the burden of proving otherwise.  Accordingly, the transfers to Schutt I and II are excepted from inclusion in decedent's gross estate under either section 2036(a) or 2038. The Court therefore need not probe other arguments by the parties with regard to the application of these statutes.

To reflect the foregoing and to give effect to the parties' stipulations,

Decision will be entered

under Rule 155.